James E. CRAWFORD et al.,
Plaintiffs-Appellants,

v.

WESTERN ELECTRIC COMPANY,
INC., et al., Defendants-Appellees.

No. 77–2565.

United States Court of Appeals,
Fifth Circuit.

April 8, 1980.

Cooper, Tallahassee, Fla., for plaintiffs-appellants.

Guy O. Farmer, II, Jeffrey H. Klink, Charles G. Cofer, Jacksonville, Fla., Patrick M. Scanlon, James B. Coppess, Atlanta, Ga., for Communications Workers of America & CWA Local 3290.

Before THORNBERRY, GEE and HATCHETT, Circuit Judges.

GEE, Circuit Judge:

Plaintiffs sought to proceed against defendants Western Electric Company ("Western Electric") and Communication Workers of America ("the union") in a non-jury class action under both Title VII[1] and 42 U.S.C. § 1981. Plaintiffs charged that the defendants discriminated against blacks at Western Electric by denying them, among other things, promotions at a rate equal to that achieved by whites. The district court declined to certify a class and granted partial summary judgment in favor of defendants on the Title VII claims. The section 1981 claims proceeded to trial, and plaintiffs lost on the merits. They appeal, complaining of several alleged errors committed by the trial court: failure to certify a class under Fed.R.Civ.P. 23; dismissal of the Title VII claims for lack of jurisdiction; failure to find racial discrimination under section 1981; dismissal of the section 1981 claims against the union; and the award of attorneys' fees to defendants. For simplicity's sake we will discuss the facts pertinent to each issue during our discussion of that issue.

### Denial of Class Certification

The district court held an evidentiary hearing on February 20, 1976; in an order a week later the district judge denied plaintiffs'[2] application for class certification

Reese Marshall, Henry Lee Adams, Jr., W. Benjamin Kyle, Jacksonville, Fla., Algie

---

1. 42 U.S.C. §§ 2000e et seq.

2. Plaintiffs at this time included presently employed black installers J. E. Crawford, R. B.

Crump, H. C. Dupree, F. J. Smith, E. I. Higginbotham, and L. I. Tunsill, plus two former black installers, L. Hodge, who was evidently discharged in October 1975 for excessive absenc-

"without prejudice to plaintiffs' reapplication at the conclusion of discovery." After that reapplication, on December 17, 1976, the district court entered an order denying class certification on the ground that the class was not so numerous that all plaintiffs could not be joined in the suit. Plaintiffs filed a motion for reconsideration of that order on April 6, 1977. On May 25, 1977, the district judge again denied plaintiffs' renewed application. The language of this order states three grounds for denial of class certification: untimeliness of the motion; impropriety under Rule 23 of repetitive applications for class certification, especially after a case has been set for trial; and the fact that the only employees shown to have a common ground for relief were the installers in the Jacksonville Division of Western Electric, a group not so numerous as to require class action treatment. The judge concluded his order of May 25 by stating, "The class action device is, therefore, not a superior device for the fair and efficient adjudication of the controversy." Even if we assume arguendo that the first two grounds articulated in this order are erroneous,[3] we will not disturb this denial of certification if the third ground, lack of numerosity, is correct. We note additionally that numerosity appears to have been uppermost in the trial judge's mind, since on May 27, 1977, in his formal denial of plaintiffs' motion to reconsider, he stated that the only appropriate class would include all installers in the Jacksonville Division of Western Electric and that that class was not so numerous that all plaintiffs could not be joined.

 The district court, in making these decisions, considered the evidence heard on February 20, 1976, memoranda submitted by both parties, and evidence presented at a hearing on December 13, 1976. Unfortunately, this court was not provided with the transcript of the evidentiary hearings on the class certification issue. Our appellate rule, Fed.R.App.P. 10(b), clearly places the duty on appellants to provide such transcripts. *McDonough v. M/V Royal Street*, 608 F.2d 203, 204 (5th Cir. 1979) (per curiam); *Green v. Aetna Insurance Co.*, 397 F.2d 614 (5th Cir. 1968). Plaintiffs appear to insist in their brief that a class should have been certified that included all present and past black *employees*, not just installers, plus all blacks whom the company had refused in the past to hire. Since plaintiffs point to no evidence in the pretrial hearing that would mandate a finding by the district judge that plaintiffs were adequate representatives of a class that included other types of employees and nonemployees, we perceive no basis on which to find error or an abuse of discretion. The fact that plaintiffs are members of the same race as the other employees and rejected job applicants whom they seek to represent in a class action is not enough in itself to require a finding under Rule 23 that their representation was adequate or that their claims were typical of the class. *See East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

Plaintiffs admitted in a pretrial brief that employees in the Installation Division of Western Electric do not share similar functions, collective bargaining representatives, physical locations, or supervisory personnel with employees in the Distribution Center. In addition, the duties done and the promotion systems differ. *See Hill v. Western Electric Co.*, 596 F.2d 99, 102–03 (4th Cir. 1979), —— U.S. ——, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979).

 We recognize that employees may, on occasion, properly represent nonemployees and vice versa. *See Payne v. Tra-*

es, and Frank McKinney, who had been laid off along with approximately 60 others in April 1975 because of a downturn in Western Electric's business. The layoffs were based on company seniority and are not an issue in this case, although we note that of the more than 60 installers affected, about one-third were black.

3. *See Elster v. Alexander*, 608 F.2d 196 at 197 (5th Cir. 1979) ("The district court has a continuing power under Fed.R.Civ.P. 23(c)(1). Its certification decision 'is not irreversible and may be altered or amended at a later date.' 7A C. Wright & A. Miller, *Federal Practice and Procedure* § 1785 at 137 (1972).").

*venol Labs, Inc.,* 565 F.2d 895 (5th Cir. 1978); *Gray v. Greyhound Lines, East,* 178 U.S.App.D.C. 91, 545 F.2d 169 (D.C.Cir. 1976); *Long v. Sapp,* 502 F.2d 34 (5th Cir. 1974); *Carr v. Conoco Plastics, Inc.,* 423 F.2d 57 (5th Cir.), *cert. denied,* 400 U.S. 951, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970); *Johnson v. Georgia Highway Express,* 417 F.2d 1122 (5th Cir. 1969); Note, Antidiscrimination Class Actions Under the Federal Rules of Civil Procedure: The Transformation of Rule 23(b)(2), 88 Yale L.J. 868 (1979). We merely hold here that when the trial court refuses to certify a class, plaintiffs on appeal must demonstrate facts in the record below that indicate, among other things, the typicality of their claims and their adequacy as representatives of the excluded members of the putative class. The evidence at the pretrial hearing could very well have shown the trial judge that plaintiffs' complaints pertained exclusively to the promotion system at the Installation Division of Western Electric, not to its hiring practices and not to other employees. Plaintiffs have failed to meet their burden on appeal, and the trial judge's ruling must be sustained.

Plaintiffs also argue that, in addition to the fifteen [4] named plaintiffs, there were nineteen former black installers who had been laid off by the company [5] and that the combined figure of 34 was sufficient to meet the numerosity requirement of Rule 23, even if the class was limited to past and present installers. This argument fails for several reasons. First, the trial judge indicated in the pretrial conference that numerosity was not the only factor that affected his decision to deny class certification. From the trial judge's remarks at that conference, we can infer that, in his judgment, adequacy of representation, typicality, and commonality were also lacking. Second, a

district court's determination of numerosity is considered final unless abuse is shown or unless the trial court applied impermissible legal criteria or standards. *Carey v. Greyhound Bus Co.,* 500 F.2d 1372, 1380 (5th Cir. 1974). We certainly cannot say that a class of 34 satisfies the numerosity requirements as a matter of law. *See Garcia v. Gloor,* 609 F.2d 156, 160 (5th Cir. 1980) (no arbitrary rules for numerosity should be established). Plaintiffs have pointed to no factor that would indicate an abuse of discretion on the part of the trial judge; therefore, we will not overturn that decision on appeal.

After the trial court refused to certify the class, plaintiffs succeeded in amending their complaint to add the remaining seven, presently employed black installers at Western Electric.[6] If plaintiffs had requested at that time to add as plaintiffs the 19 other black installers who had been laid off by Western Electric, that addition, if granted, could probably have been upheld on appeal.[7] However, plaintiffs did not move to do so, and they make no complaint to us regarding the 19 former black installers except in the context of their arguments about denial of class certification. Thus, the claims of those 19 layoff victims are not before us.

We wish to emphasize here that, because we uphold the denial of class certification, the only practice of Western Electric now before us is its Index Plan; its hiring practices and practices regarding employees other than the Jacksonville installers are not now at issue.

### Title VII Jurisdiction

The trial court dismissed the Title VII claims of the eight original plaintiffs against Western Electric on May 27, 1977.

---

**4.** Seven other black installers were later added to the eight plaintiffs named in note 2, *supra,* as individual plaintiffs. *See* note 6, *infra.*

**5.** *See* note 2, *supra.*

**6.** These seven included R. B. Wright, P. A. Cue, W. J. Newsom, A. C. Bartley, R. J. Burton, S. Hodge, and W. L. Wingard.

**7.** We make this statement in light of the fact that F. McKinney, a layoff victim, was an original plaintiff, and Western Electric thus was put on notice of complaints common to these former employees.

The court based its decision to dismiss the Title VII claims of plaintiffs Dupree, L. Hodge, Smith, and Tunsill on the fact that they had received an alleged "right to sue" notice more than 90 days before suit was brought, citing *Zambuto v. American Telephone & Telegraph Co.*, 544 F.2d 1333 (5th Cir. 1977). The Title VII claims of plaintiffs Crawford, Crump, Higginbotham, and McKinney against Western Electric were dismissed because they had failed to file any administrative charge with the Equal Employment Opportunity Commission (EEOC). On June 1, 1977, the trial court dismissed the Title VII claims of the seven plaintiffs who were added to the complaint after denial of class certification, again on grounds that they had failed to file administrative charges against Western Electric with the EEOC.

Earlier the trial court had given plaintiffs an opportunity to file affidavits in opposition to the union's motion to dismiss the Title VII claims against it. Plaintiffs failed to do so, and the trial court dismissed those claims on May 10, 1977, on the ground that none of the plaintiffs had named the union as respondent in his charges to the EEOC.

 The timely filing of a complaint with the EEOC is a prerequisite to bringing a Title VII action in federal court. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Chappell v. Emco Machine Works Co.*, 601 F.2d 1295, 1297 (5th Cir. 1979); *MacArthur v. Southern Airways*, 569 F.2d 276 (5th Cir. 1978) (en banc). Since plaintiffs offered no proof that they had ever filed an EEOC charge naming the union as a respondent, the trial judge correctly dismissed the Title VII claims as to that defendant. *See Cutliff v. Greyhound Lines, Inc.*, 558 F.2d 803 (5th Cir. 1977).

The Title VII claims against Western Electric present a closer question. Some knowledge of the pertinent facts is necessary to an understanding of the trial judge's decision.

It is clear that at least some of the plaintiffs filed administrative charges of discrimination against Western Electric with the EEOC.[8] The EEOC investigated these charges, and in December 1973 the EEOC sent one plaintiff a copy of a proposed conciliation settlement with Western Electric. The plaintiffs rejected this settlement. In early January 1974, plaintiffs' attorney received a letter from the EEOC stating that the EEOC and Western Electric would enter into a bilateral agreement. The letter further stated: "If you find that the dollar consideration is not acceptable to your clients the agreement with the Respondent will not waive any of the rights of your client to obtain a larger monetary settlement in court." The EEOC and Western Electric did sign the bilateral agreement in late January 1974. A copy of this agreement, along with a cover letter addressed to Western Electric, *not* to plaintiffs, was mailed to plaintiffs' attorney and received in early February 1974. In the agreement, the EEOC

> waives, releases and covenants not to sue the respondent with respect to any matters which were or might have been alleged as charges filed with the Equal Employment Opportunity Commission, *subject to performance by the Respondent of the promises and representations contained herein.* The Commission shall determine whether the Respondent has complied with the terms of this Agreement.

(emphasis added).

The plaintiffs who had filed charges with the EEOC evidently did nothing further until March 1975, when, through counsel, they requested "right-to-sue letters" from the EEOC. The EEOC sent the requested letters in late March 1975, and plaintiffs filed their complaint in federal court in early June 1975, within 90 days of receipt of the right-to-sue letters.

 Congress, in enacting Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, intended, by its requirement that the aggrieved party first file an

---

**8.** These plaintiffs are discussed *infra.*

administrative charge with the EEOC, that the EEOC be given time to conciliate claims. *See, e. g., Alexander v. Gardner-Denver Co., supra; Carr v. Conoco Plastics, Inc.,* 423 F.2d at 61. The Act further provides for private suits if conciliation fails but limits the time within which suits can be brought to 90 days after the plaintiff receives notice that the administrative process has ended.[9] *See Page v. U. S. Industries,* 556 F.2d 346 (5th Cir. 1977). If not brought within 90 days of receipt of the required notice from the EEOC, the suit is barred in federal court. *See, e. g., Hefner v. New Orleans Public Service, Inc.,* 605 F.2d 893 (5th Cir. 1979).

The initial question we face is what manner of notice suffices to start the running of the 90-day period. Under our cases, if plaintiff is notified (1) that conciliation efforts on his or her behalf have failed and (2) that the EEOC intends not to sue the respondent, plaintiff has then received notice that the administrative process is at an end. The 90-day period begins to run at that point. *See Page v. U. S. Industries, Inc., supra; Zambuto v. American Telephone & Telegraph Co., supra.* The notice need not inform the complainant that he or she has only 90 days within which to file suit. *Page v. U. S. Industries,* 556 F.2d at 351 n. 2.

Defendants evidently convinced the trial judge in this case that the sending of the conciliation agreement to plaintiffs' attorney constituted sufficient notice under Title VII to trigger the 90-day period. We cannot agree. While there is no doubt that the agreement sufficed as notice that conciliation between plaintiffs and Western Electric had failed, since plaintiffs consistently rejected settlements proposed by the EEOC, the agreement contained no *unconditional* statement that the EEOC had decided not to sue. In fact, from the language of the agreement, it could be inferred that the EEOC would continue to monitor compliance with the agreement on an administrative level and would sue if defendants failed to live up to the terms of that agreement. Therefore, the second factor indicative of the termination of the administrative process, that is, unequivocal notice that the EEOC would not sue respondent, is lacking in this case. Thus, we hold that the trial court erred in dismissing the Title VII claims of plaintiffs Dupree, L. Hodge, Smith, and Tunsill. These plaintiffs proved that they had filed administrative charges with the EEOC and proved that they received right-to-sue letters within 90 days of the filing of the complaint in federal court.

*Page v. U. S. Industries, supra,* does not dictate a contrary result. In *Page,* one plaintiff received a letter from the EEOC stating that the agency had been successful in its conciliation efforts with respondent but that no specific remedy was provided for plaintiff. 556 F.2d at 354. We stated:

> The logical import of the . . . letter could only be that the EEOC was satisfied with the outcome of the conciliation process and would not be filing suit against [respondent], since one does not typically sue to remedy the outcome of an administrative proceeding he regards as successfully terminated. Thus, this letter should have informed Page both that the conciliation process had come to a close *and* that the EEOC did not intend to file suit . . . .

*Id.*[10]

---

9. The statutory language reads:
> If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within one hundred eighty days from the filing of such charge . . . the Commission has not filed a civil action . . . or the Commission has not entered into a conciliation agreement *to which the person aggrieved is a party,* the Commission . . . shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought.
>
> 42 U.S.C. § 2000e–5(f)(1) (emphasis added).

10. The letter, however, went on to inform plaintiff, among other things, that he could request a right-to-sue notice from the EEOC and that he would have 90 days from such letter's receipt to file suit. Consequently, plaintiff was affirmatively misled by the EEOC's advice regarding the necessity to request a right-to-sue letter. *Id.* at 355. It

■ Here, unlike the *Page* situation, neither the letter in early January nor the conciliation agreement sent to plaintiffs' attorney unambiguously ruled out a suit by the EEOC. Nor was the agreement accompanied by any letter to *plaintiffs* informing them of the status of their complaint or of the EEOC's intent in the matter. To hold that the EEOC can discharge its duty to notify charging parties of their right to sue by sending them copies of a letter and an agreement *addressed to respondents*, neither of which contain an . unconditional statement that the EEOC intends not to sue, would do a disservice to the broad remedial nature[11] of Title VII. We have refused in the past to "visit the effects of EEOC's erroneous practice" on plaintiffs, *Zambuto v. American Telephone & Telegraph Co.*, 544 F.2d at 1336, and we refuse to do so here.[12]

We also find that *Hefner v. New Orleans Public Service, Inc.*, 605 F.2d 893 (5th Cir. 1979), is inapposite. There plaintiff received a letter from the EEOC in 1974 *explicitly* stating that plaintiff's file had been administratively closed; that event, not a right-to-sue letter issued 22 months later, triggered the 90-day period. Plaintiffs here received nothing so explicit from the EEOC.

As was mentioned above, the Title VII claims of original plaintiffs Crawford, Crump, Higginbotham, and McKinney against Western Electric were dismissed because they had not filed initial charges with the EEOC, as were the Title VII claims of added plaintiffs Wright, Cue, Newsom, Bartley, Burton, S. Hodge, and Wingard.[13] Plaintiffs have not urged us to allow these nonfiling plaintiffs to litigate their Title VII claims. We note that the law regarding nonfiling plaintiffs, where at least some plaintiffs have filed EEOC charges, is in a state of flux. Some of our cases seem to allow nonfiling plaintiffs, when class certification is denied, to join in a suit brought by filing plaintiffs, at least to the extent of the charges filed against defendant-respondent with the EEOC by the filing plaintiffs. *See Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1254–55 (5th Cir. 1979) rehearing en banc granted on other grounds, 604 F.2d 449 (1979); *cf. Wheeler v. American Home Products*, 563 F.2d 1233 (5th Cir. 1977) (republished at 582 F.2d 891) (nonfiling intervenors could be awarded back pay); *Romasanta v. United Air Lines, Inc.*, 537 F.2d 915 (7th Cir. 1976), *aff'd sub nom. United Air Lines, Inc. v. McDonald*, 432 U.S. 385, 97 S.Ct. 2464, 52 L.Ed.2d 423 (1977) (nonfiling intervenor could appeal denial of class certification); *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496 (5th Cir. 1968) (not all members of class in action under Title VII need file EEOC charges). Other decisions do not allow this. *See Hodge v. McLean Trucking Co.*, 607 F.2d 1118 (5th Cir. 1979) (per curiam); *Inda v. United Air Lines, Inc.*, 565 F.2d 554 (9th Cir. 1977). Without adequate and forceful briefs and oral argument to assist us, we decline to decide the question here.

Western Electric insists that the dismissal of plaintiffs' Title VII claims was, at most,

---

should be noted that we condemned such "two-tier" notices in *Zambuto, supra* ; however, no two-tier procedure was used in this case.

**11.** *See, e. g., Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974).

**12.** Although we realize that the EEOC issued the notice of right to sue in 1975, long before we decided *Zambuto* in 1977, we take the occasion here to observe that use of a simple form by the EEOC to inform charging parties of their statutory remedies would have spared the courts and litigants countless hours of unnecessary work. We trust that the EEOC has taken

*Zambuto*'s holding to heart and is now issuing its notices in clear, plain language.

**13.** Some of these plaintiffs evidently filed EEOC charges. Plaintiffs Crawford, Crump, Higginbotham, and McKinney apparently were held not to have filed charges because defendants' request for admissions on this issue went unanswered by plaintiffs. The record shows that Crump, at least, filed a charge of discrimination with the EEOC against Western Electric. In addition, all of the 15 plaintiffs except Cue, Bartley, Burton, and McKinney received right-to-sue letters. However, receipt of a right-to-sue letter is not proof that plaintiff filed a charge of discrimination with the EEOC. *Cutliff v. Greyhound Lines, supra.*

harmless error. It is defendant's argument that plaintiffs' claims under Title VII and 42 U.S.C. § 1981 were interchangeable and that trial on the merits of plaintiffs' Title VII claims would have been based on precisely the same facts as were presented in support of plaintiffs' section 1981 claims.

▆▆▆▆ We find two flaws in that argument. First, the limitations period for section 1981 claims may be shorter than that for Title VII claims. Under section 1981 the federal courts borrow state statutes of limitations, see, e. g., Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); Page v. U. S. Industries, supra, usually calculated from the date on which suit was filed. Under Title VII, however, the court may base liability on acts occurring anytime during or after the charge filing period.[14] Second, an action under 42 U.S.C. § 1981 requires a showing of discriminatory intent. Williams v. DeKalb County, 582 F.2d 2 (5th Cir. 1978) (On rehearing); cf. Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (burden of proof under the fifth amendment). Plaintiffs pursuing claims under Title VII, on the other hand, may seek to prove disparate *treatment* based on an impermissible factor (e. g., race or sex) or disparate *impact* on a protected group of a neutral practice. While proof of discriminatory intent is required in disparate treatment cases, International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977), other types of claims under Title VII do not require a showing of discriminatory motive. Id.; Scott v. City of Anniston, 597 F.2d 897 (5th Cir. 1979).

▆▆ There is some indication in the trial court's memorandum opinion that the court gave little consideration, for purposes of liability, to racial incidents that happened before the limitations period under section 1981.[15] We must remand to allow the trial court to adjudicate the merits of plaintiffs' Title VII claims in light of that statute's limitations period. If there is proof of discriminatory practices or acts within or subsequent to the relevant 180-day period,[16] the trial court can base Title VII liability on those acts. Of course, back pay relief under Title VII is limited to the two years preceding the filing of a charge with the EEOC. 42 U.S.C. § 2000e–5(g). However, *liability* of the employer for back pay may be based on acts occurring outside the two-year period if a current violation is shown. Miller v. Miami Prefabricators, Inc., 438 F.Supp. 176, 178–80 (S.D.Fla.1977); see also Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 260 (5th Cir. 1974).

### The Index Plan

Before we discuss the trial court's decision on the merits of plaintiffs' section 1981 claims, we must describe in some detail Western Electric's promotion system, the basis of most of plaintiffs' complaints.

Western Electric's Jacksonville Installation Division installs, modifies and removes telephone company central office equipment and commercial PBX exchanges for Bell System companies and their industrial, commercial, and governmental customers. The compensation, terms, and conditions of employment of hourly workers in Jacksonville Installation are governed by a collective bargaining agreement between West-

**14.** Title VII, 42 U.S.C. § 2000e–5(e) provides: "A charge under this section shall be filed within one hundred eighty days after the alleged unlawful employment practice occurred . . .." See also United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). Thus, the charge filing period begins 180 days before an EEOC charge is filed.

**15.** For some plaintiffs, January 1, 1974, was held to be the earliest date on which back pay liability could accrue under section 1981; for others, the earliest date was May 24, 1975.

Plaintiffs do not contest these dates in their briefs.

**16.** The period runs backward from the date on which the first EEOC charge was filed. That date for each plaintiff is not clear from the record. Some plaintiffs filed charges in January 1973, and others seem to have filed in 1972. We leave to the trial court the task of ascertaining the proper date from which to calculate the time limits under Title VII for each plaintiff.

ern Electric and the union. Versions of this agreement have applied for the entire period covered by the litigation. Under the agreement, the hourly wages of installers are dependent, in part, on the skill category, called an "index," to which the installer is assigned by Western Electric.

Western Electric formulated and published an Index Plan. Under this plan there are five index levels, numbered from one to five, and an installer is assigned to one of the five indexes on the basis of his or her level of skill. All newly hired installers are assigned Index 1; they can be assigned a higher index whenever management determines that they have acquired the skills to meet the requirements of the Index Plan.

The plan divides installation work into various work operation codes. To advance to the next index, an installer must be "qualified" in the operation codes required for that higher index. In general, qualification in a particular work operation code depends on the installer's demonstrated ability to perform that work at expected levels of quality, production, and skill, with due regard to safety considerations. Additionally, the Index Plan requires the installer to perform certain work operations at the Index 2 and 3 levels for prescribed minimum numbers of hours before qualification.

To be upgraded to Index 2, an installer must be qualified in three work operations, which include basic wiring and cabling, and to perform under specific, detailed, written or oral directions. To be upgraded to Index 3, an installer must be qualified in two additional work operations, complex wiring and either basic testing or clerical and service. Basic testing requires a minimum number of hours, but the others do not. The installer must also have the ability to perform Index 3 work under general directions. To advance to Index 4, an installer must be qualified in basic testing (if the installer has not previously qualified in that code, and in any one of a number of sets of specified codes associated with particular equipment or a particular system. Additionally, the installer must demonstrate

ability to perform circuit tests and to clear trouble encountered, using complex information sources under minimum directions. An Index 5 installer is a "systems tester." To advance to this level, an installer must demonstrate ability to perform under minimum direction with a high degree of individual initiative and technical skill, to perform independently procedures that are broad in scope, and to analyze and associate information from all sources. An Index 5 installer must be qualified in code 519 and any one of 14 other codes.

Advancement of an installer to the next index level depends not only on the installer's being rated "qualified" in the specific codes necessary for advancement but also on the length of the installer's service with the company. These residency periods have decreased over the years; in 1965, for example, the residency requirement for Index 5 was once five years, but at present the requirement for Index 5 is only three years' service with the company. All plaintiffs in this action met, at the time suit was filed, the residency requirement for Index 5, so that requirement did not operate to slow any plaintiff's advancement.

The number of hours worked by an installer in each kind of work operation is relayed on a weekly basis to Western Electric's headquarters in Atlanta, where the information is transferred to a computer tape and summarized, by work operation code, for each installer. Every six months the computer generates a form, number 1421, showing separately the time worked in each of the various work operations for each installer during that six-month period and cumulatively.

Index reviews of all installers, the procedure by which installers are advanced to the next highest index, are conducted in June and December of each year. The index reviews begin when line supervisors receive 1421 forms for all the installers working immediately under them. The 1421 form shows whether an installer has worked at all in a particular work operation code; if so, the computer automatically gives the

installer a rating of 8 in that code. The line supervisors, if they think an installer has qualified in that code, can recommend to their suborbit supervisor that the installer be given a 9, indicating qualification. After receiving the reports from the line supervisors, the orbit and suborbit supervisors go into conference and determine whether installers who have ratings of 8 deserve ratings of 9 in a particular code. If an installer receives ratings of 9 in all the required codes, he will then advance to the next higher index. A collective judgment is made by all supervisors for whom the installer has worked during the preceding six-month period. The results of the index review conference are reviewed by higher management. The Index Plan provides that an installer, to be qualified (rated 9) in any work operation code, shall have demonstrated his ability to do the work operation for the cumulative period necessary to assure continued proficiency (average or better safety, quality, and production) and must have previously qualified in the next lower index.

The collective bargaining agreement allows an installer who is dissatisfied with the outcome of an index review to file a grievance. If this is done, management provides written reasons for the decisions made in the index review. However, these grievances are not subject to arbitration.

Advancement to a higher index level does not depend on the existence of a vacancy in that level, nor are any written or manual tests administered by Western Electric for upgrading to a higher index. Any installer may be assigned duties in any work operation code; frequently Index 4 and 5 installers perform work in the codes within Indexes 2 and 3.

To summarize the Index Plan, installers are hired at Index 1. They may progress to successively higher indexes, providing they (1) perform *work* in the proper codes within the higher index and (2) receive a rating in the index review conference indicating that they are *qualified* in the proper codes.

### Standard of Review

The ultimate legal issue in a Title VII or section 1981 case is whether discrimination occurred, although this question is also one of fact. *Burdine v. Texas Department of Community Affairs*, 608 F.2d 563 (5th Cir. 1979). We are bound by the trial court's findings of subsidiary facts, often called evidentiary facts, that are not clearly erroneous, but we must independently examine the merits of plaintiffs' allegations, *id.; East v. Romine, Inc.*, 518 F.2d 332 (5th Cir. 1975), and we should also examine the record to determine whether the ultimate finding is based on requisite subsidiary facts. *Id.* at 339.

### Proof of Discrimination

At the close of plaintiffs' case, the trial court granted the union's motion for involuntary dismissal under Fed.R.Civ.P. 41(b), stating that no prima facie case had been made as to the union. We agree with the trial court. Only three plaintiffs testified to filing grievances with the union during the time covered by the statute of limitations. None of the three pointed to any white installers who fared any better than he in grievance procedures. Since the scant evidence regarding the union did not rise to the level of a prima facie showing, *see infra*, we affirm the court below on this issue.

Plaintiffs' case against Western Electric, however, was much stronger and survived a motion under Rule 41(b). Nonetheless, the trial court stated in its memorandum opinion:

> The court seriously doubts that the plaintiffs have even established a prima facie case against their employer. . . . Even assuming that a prima facie case was established, the evidence evaluated as a whole leads the court to the conclusion that the charges of racial discrimination have not been established by a preponderance of the evidence.

Plaintiffs sought to prove that the Index Plan was *operated* in a discriminatory man-

ner.[17] Their evidence consisted of statistics, exhibits, stipulations, and testimony. We will first address the statistics and then follow with an analysis of plaintiffs' evidence regarding the subjective nature both of the process by which work is assigned and of the index review procedure.

### A. The Statistical Case.

Western Electric's Jacksonville Installation Division has never employed a black supervisor,[18] nor has any black person ever advanced to Index 5. Western Electric employed no black installers between 1940 and 1960. The first plaintiffs to become installers were R. B. Wright and F. J. Smith, hired in 1964. The hire dates and dates of promotion for each plaintiff are set out in the margin.[19]

The pretrial stipulation contained the names and hire dates of all installers who were working for Western Electric as of January 1, 1976. The race of each installer was given, as were the number of months each required to achieve Index 2, Index 3, and so forth. In Western Electric's analysis of the stipulated figures, the advancement times of *all* white installers, regardless of date of hire, were averaged and compared with blacks. This analysis revealed the following:

Average Time (in Months) to Advance to:

| | Index 2 | Index 3 | Index 4 | Index 5 |
|---|---|---|---|---|
| Blacks | 17.8 | 55.8 | 79.0 | |
| Whites | 17.2 | 60.8 | 98.8 | 153.6 |

In the pretrial stipulation, plaintiffs reserved the right to challenge the accuracy of the foregoing statistical analysis,[20] and did so at trial. Plaintiffs pointed out that some whites whose advancement times were figured into the averages were hired in the 1950's and early 1960's when the Index Plan, the "residency" requirements for advancement, and operative economic factors were different from those existing during the years when Western Electric hired blacks. Plaintiffs thus called to the court's attention the need for caution in approaching the statistics, and plaintiffs' objections were sufficient to preclude a holding that they stipulated to Western Electric's analysis, even though they failed to present any alternative analysis to assist the court.

To isolate by means of statistics the causes for a phenomenon, it is necessary to hold constant as many relevant variables as possible. Advancement times of installers hired in the middle 1950's cannot validly be compared with the times of those hired in the late 1960's, since many variables other than race, such as economic conditions, the promotion plans then in effect, the residency requirements, demographics, needs of the company, and strength of employee organizations, could explain a different rate of advancement for the two groups. Therefore, since date of hire was not held constant in Western Electric's analysis, that analysis is not statistically valid. We also note that some of the more intelligent and

**17.** Plaintiffs seem to concede that the plan is nondiscriminatory in *design* and that it is necessary to Western Electric's safe and efficient operation.

**18.** Supervisors are promoted from the ranks of Index 5 installers; such promotions depend on vacancies being available.

**19.**

| Crawford | Higginbotham | Cue |
|---|---|---|
| Hired 1/68 | Hired 6/69 | Hired 2/70 |
| To Index 2 12/69 | To Index 2 12/70 | To Index 2 12/73 |
| To Index 3 6/77 | | To Index 3 12/76 |

| Crump | Tunsill | Newsom |
|---|---|---|
| Hired 6/69 | Hired 6/66 | Hired 6/69 |
| To Index 2 6/70 | To Index 2 12/68 | To Index 2 12/70 |
| To Index 3 12/75 | To Index 3 6/72 | To Index 3 6/74 |

| Dupree | Wright | Bartley |
|---|---|---|
| Hired 6/68 | Hired 6/64 | Hired 2/69 |
| To Index 2 6/69 | To Index 2 4/66 | To Index 2 12/72 |
| To Index 3 12/72 | To Index 3 12/67 | To Index 3 12/76 |
| | To Index 4 12/71 | |

| L. Hodge | S. Hodge | Burton |
|---|---|---|
| Hired 2/68 | Hired 2/68 | Hired 1/70 |
| To Index 2 12/69 | To Index 2 6/70 | To Index 2 6/71 |
| To Index 3 6/71 | To Index 3 6/72 | To Index 3 6/73 |
| Discharged 10/75 | To Index 4 12/73 | |

| Smith | Wingard | McKinney |
|---|---|---|
| Hired 6/64 | Hired 6/68 | Hired 3/72 |
| To Index 2 12/67 | To Index 2 6/69 | To Index 2 12/73 |
| To Index 3 6/71 | To Index 3 6/72 | Resigned (layoff) 4/75 |

**20.** Plaintiffs do not challenge individual advancement times, merely the analysis.

ambitious installers hired in the 1950's and 1960's had, in all likelihood, become supervisors by January 1976. We assume their advancement rates, although not reflected in the stipulated figures, would have been faster than their white contemporaries who remained installers.[21]

A more valid comparison between blacks and whites can be drawn from the stipulated figures. Advancement rates of whites hired in 1964 or later can be ascertained and laid alongside the rates of blacks. Our own rough calculations[22] using such figures show the following:

| Blacks | | Average Months to Advance to: | | | |
|---|---|---|---|---|---|
| No. Hired | Year Hired | Index 2 | Index 3 | Index 4 | Index 5 |
| 2 | 1964 | 20 | 50.5 | 89 (1) | – |
| 1 | 1966 | 29 | 72 | – | – |
| 5 | 1968 | 19.2 | 48.3 | 69 (1) | – |
| 6 | 1969 | 14.8 | 57.6 | – | – |
| 1 | 1970 | 18 | 43 | – | – |
| 1 | 1972 | 21 | – | – | – |
| Total Blacks (16) | | 18.3 | 53.6 | 79 | – |

| Whites | | Average Months to Advance to: | | | |
|---|---|---|---|---|---|
| No. Hired | Year Hired | Index 2 | Index 3 | Index 4 | Index 5 |
| 4 | 1964 | 14.7 | 47.8 | 83 | 105.5 |
| 1 | 1965 | 22 | 52 | – | – |
| 2 | 1966 | 17 | 35 | 82.5 | – |
| 4 | 1967 | 15.2 | 44.3 | 64.5 | – |
| 10 | 1968 | 17.8 | 40.7 | 64.3 | 87 |
| 16 | 1969 | 18.6 | 40.9 | 51.3 | 59.3 |
| 6 | 1970 | 15.7 | 36.5 | 56 | 58 |
| 1 | 1971 | 15 | 33 | 69 | – |
| Total Whites (44) | | 17.2 | 41 | 63.8 | 76.3 |

These figures reveal a much different picture than that reflected in Western Electric's statistical analysis. For example, whites hired contemporaneously with blacks seem on the average to have achieved Index 3 a full year *sooner* than their black co-workers, not five months *later*, as suggested by Western Electric's analysis. Moreover, whites in that group reached Index 5, on average, in 76.3 months after hire, rather than in the 153.6 months that Western Electric's averages indicate.

### B. *Subjectivity and Racial Incidents.*

Western Electric parcels out its projects to various orbit supervisors. Suborbit and line supervisors then devise a work opera-

21. For example, the North Florida area manager was hired as an Index 1 installer in 1952 and made line supervisor in 1960; B. E. Snipes, an orbit supervisor, began as an Index 1 installer in 1951 and became a supervisor in 1963; W. E. McLanahan, hired in 1953, was promoted to supervisor in 1967; C. M. Wellborn began as an Index 1 installer in 1963 and became a line supervisor in 1972, after taking seven years to reach Index 5.

22. Neither this table nor anything comparable was introduced at trial. However, the figures are not difficult to arrive at using simple arithmetic and the pretrial stipulation. We deplore the lack of initiative demonstrated in this regard by plaintiffs' attorneys, but in light of the disparities between these figures and defendant's analysis, we cannot allow a judgment to stand that rests in large part on such an erroneous analysis. The trial court will be free on remand to make its own analysis but should not consider advancement times for any whites hired before 1964.

tions or job plan for the project, indicating the complexity of each job and approximate number of hours needed to complete each phase. The orbit supervisor then selects the employees for the project and assigns them to work under suborbit and line supervisors. Specific assignments of tasks are made by the line supervisors, who are given a "contract" by Western Electric that indicates the number of hours the project should take and are graded on how well they stay within the budgeted number; if they bring a job in "under budget,"[23] they receive a high rating. These ratings are important to their advancement within management. Line supervisors have a great degree of control over an installer's rate of advancement, partly through their control of specific work assignments of installers; if an installer is not assigned work in codes within the next higher index, no advancement to that index is possible. Also, the line supervisors' evaluations of an installer's work are crucial factors in the index review decision to rate an installer "qualified" in a particular code.

Western Electric's witnesses admitted that (1) supervisors have no written instructions to guide them in their granting ratings of 9; (2) the company has no way to tell whether every supervisor uses standardized criteria in making his evaluations of installers' qualifications; (3) if an installer is not given a 9 in the index review, no reasons for the decision are contemporaneously recorded in written form; (4) line supervisors keep no permanent written records of the quality and efficiency of each installer's work; and (5) supervisors' assignments of installers to particular tasks are based on a variety of factors, one of which is the installers' perceived skills.

Most plaintiffs[24] testified that certain white installers hired after them or at the same time advanced to higher indexes than they had achieved. Additionally, the plaintiffs testified that they had not been assigned work in higher codes even though they had requested such assignments from their supervisors. Their testimony also detailed instances of supervisors' addressing them as "boys" and other racially motivated language and conduct by coworkers in the 1960's;[25] some of those coworkers are now supervisors. While some or most of this evidence may concern time-barred conduct, it is relevant, *United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), and may be used, in conjunction with statistics, to illuminate current practices which, viewed in isolation, may not indicate discriminatory motives. Cf. *Local Lodge No. 1424 v. N. L. R. B.*, 362 U.S. 411, 80 S.Ct. 822, 826, 4 L.Ed.2d 832 (1960) (Bryan Manufacturing) (Events occurring before the six-month limitation period under section 10 of the National Labor Relations Act, 29 U.S.C. § 160, "may be utilized to shed light on the true character of matters occurring within the limitations period."). Finally, plaintiffs brought out several incidents[26] that tended to prove that Western Electric gave its supervisors substantial discretionary power over installers' advancement rates.

Basically, then, plaintiffs sought to prove discrimination both in work assignments and in the index review process. They alleged that they were not given work assignments that would allow them to advance as rapidly as whites to higher indexes and that the subjective nature of both the process by which work assignments are made and the process by which installers are rated "quali-

23. No money figure is involved, merely hours.

24. All named plaintiffs testified except P. A. Cue.

25. The court evidently found this evidence credible. It held:

Other specific incidents testified to by the plaintiffs lead the court to conclude that the plaintiffs have indeed been the subject of racial slurs by co-workers and on rare occasions dis-

courtesies from supervisors. Most of these incidents occurred in or about 1967. Such incidents have virtually ceased since that time. While there is no legitimate excuse for these events, they are not such as to permit the court to conclude that the plaintiffs have been discriminated against by the Company with respect to the terms of their employment.

26. *See* notes 29 and 30, *infra*.

fied" operated to impede black installers' advancement within the index system.

### C. *Plaintiffs' Burden.*

We require a showing of purposeful discrimination in cases brought under 42 U.S.C. § 1981. *Grigsby v. North Mississippi Medical Center, Inc.*, 586 F.2d 457 (5th Cir. 1978); *Williams v. DeKalb County*, 582 F.2d 2 (5th Cir. 1978) (on rehearing). In cases alleging disparate treatment under Title VII, which also require proof of intent, *Teamsters, supra*, 97 S.Ct. at 1854 n. 15, plaintiffs may establish a prima facie violation by showing that they are members of a group protected by Title VII, that they sought and were qualified for positions that Western Electric was attempting to fill, that despite their qualifications they were rejected, and that after their rejection Western Electric either continued to attempt to fill the positions or in fact filled the positions with whites. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). We think the articulation in *Green* of the elements of a prima facie case is equally applicable in cases under section 1981.[27] However, there are other ways to prove intentional discrimination. *Teamsters, supra*, 97 S.Ct. at 1866. *Green* merely prescribes one method by which a rebuttable inference of intent can arise. Statistical disparity between blacks and whites, especially when coupled with direct evidence of racially motivated conduct or language, might also, in a proper case, satisfy plaintiffs' initial burden. *Cf. Teamsters, supra* (pattern and practice suit by the government); *Grigsby v. North Mississippi Medical Center, Inc., supra* (statistics without evidence of purposeful discrimination failed to establish a prima facie case).

**27.** Defendant Western Electric does not dispute this point and in fact urged it in briefs before the trial court and before us. In any event, section 1981 "is a parallel remedy against discrimination which may derive its legal principles from Title VII." *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979).

**28.** 42 U.S.C. § 1981 reads:

Applying *Green*'s elements to these facts, we see that all plaintiffs are protected by section 1981 from racial discrimination.[28] They proved that they sought advancement to higher indexes; although work assignments to higher codes do not depend on an installer's requesting such work, most plaintiffs testified that they did make those requests, and we will assume arguendo that all of them sought the higher pay concomitant with higher index ratings.

The trial court found that "no evidence was produced by the plaintiffs to show that they were qualified to do the work that they claim was discriminatorily denied them." The court presumably intended to indicate that plaintiffs failed to satisfy *Green*'s second element. Work assignments to codes in higher indexes depend on two factors: an installer's skill level, as perceived by his or her supervisor; and, usually, an installer's achieving, for example, the Index 2 level before being assigned work within Index 3. All plaintiffs satisfied the latter factor; thus, the court must have found that they had not sufficiently proved their levels of skill.

Establishing qualifications is an employer's prerogative, *Rowe v. General Motors Corp.*, 457 F.2d 348, 358 (5th Cir. 1972), but an employer may not utilize wholly subjective standards by which to judge its employees' qualifications and then plead lack of qualification when its promotion process, for example, is challenged as discriminatory. *See id.* at 358–59. *Rowe* condemned subjective evaluations by white foremen of black employees' "ability, merit, and capacity," *id.* at 353, 358–59; we think Western Electric's "skill" requirement, since it is not based on any written evaluation or articulated standard, is equally suspect.

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Plaintiffs brought out, on direct examination of their own witnesses [29] and on cross examination of Western Electric's witnesses,[30] testimony indicating that the index review system depends on highly subjective elements. This court and others have expressed a skepticism that Black persons dependent directly on decisive recommendations from Whites can expect non-discriminatory action. See, *Hawkins v. North Carolina Dental Society*, 4 Cir., 1966, 355 F.2d 718, 723–724; *Cypress v.*

29. We give here some examples of this testimony:

> *Dupree*: So that is when I inquired again about, well, you know, if I needed that [work] to advance to Three, then, when can I get it.
>
> So [the supervisor] said, "Well, I will let you know. When I think you are ready to make Three I will make you a Three."
>
> \* \* \* \* \* \*
>
> I said, "You are training him. Why can't I get some of the training?"
>
> He said, "Because I want to train Anderson. I am the supervisor and you are the installer. If I want to train Anderson I train Anderson. If I want to train you I train you."

> *Tunsill* [questioned by his attorney]:
> Q How are your hours recorded?
> A It depends on what operation code you work in. You have what's called a time ticket and you record your hours each week depending on what you have done.
> Q Do you record that?
> A Sometimes—of late we have been recording it, and—
> Q Who—excuse me. I'm sorry. Go ahead.
> A It is subject to the approval of the supervisor, of course, and all the time you may not agree.
> Q He might not agree with the hours you say you worked?
> A *Type* of work you said you did.
> Q What would the supervisor do if he didn't agree with the type of work you say you have done?
> A He would change it as to what he feels you had done.
> Q Do you have any appeal rights? Can you challenge his changing of your hours?
> A I don't think that—no, you can't challenge it. I think that is the final word.
> (emphasis added.)

> *Newsom* [questioned by his attorney]:
> A I was talking with A. D. Jones about doing some work so that I could advance to Three Index and he said, "Did you ever think about being a bus driver?" I replied, "No, I haven't."
> He said, "Well, I think you will make a good bus driver because you are not going to make a good installer."
> Q. Who was A. D. Jones?
> A He was my supervisor at the time.
> Q Would he have been one of the persons who would have to qualify you to go up the Index system?
> A Yes, he was.

> *Crump* [questioned by his attorney]:
> A In approximately 1971 I was going between the two systems, crossbar system and step system. I talked with [the supervisor] and asked him about going to school because when I asked him about my promotions he told me I was not trained in the system.
> So I asked him about a system, school, and he made the reply to me at that time that I don't need any training.
> Q That you didn't need any training?
> A Don't need any training.
> Q Did you ask him what he meant by that?
> A He told me that a man of your background and whatever, he didn't figure there was nothing they could teach me. That was his remark. He asked me if I ever thought about selling shoes.

30. John Livingstone, North Florida Installation Manager, testified (on being questioned by plaintiffs' counsel):

> Q [I]s there any reason why one installer should be assigned more test code operations over another installer?
> A There could be. The one who's getting the test code operations may be in the building where the test work is and the other man may not.
> Q Well, who has the control over what buildings you are sent to?
> A The supervisor does.

When cross examined about the index reviews, Livingstone gave the following testimony:

> Q My question to you was, when the supervisor is at the Index Review Board, there's a meeting going on and you're not present?
> A That's right.
> Q How would you know what standards he's applying to John Doe, the employee, to determine whether or not he should be raised or not?
> A I guess, Mr. Marshall, I just have to trust him. I have been to several Index Reviews and I have not found anybody that was that out of line on any of the people there, plus the fact that the man always has the prerogative to file a grievance and have it reviewed again.

*Newport News General and Nonsectarian Hosp. Assn.,* 4 Cir., 1967, 375 F.2d 648, 655; *Meredith v. Fair,* 5 Cir., 1962, 298 F.2d 696, 702, cert. denied, 1962, 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed.2d 66.

*Rowe,* 457 F.2d at 359. We find that all plaintiffs who sought work assignments in and promotion to the next higher index proved themselves prima facie qualified to do that work and satisfied *Green*'s second prong.

Plaintiffs also needed to prove whites were given work assignments and ratings of 9 necessary to advance to the next index faster than blacks. The statistics gleaned from the pre-trial stipulation show that black installers receive promotions to higher indexes at rates much slower than their white contemporaries. Additionally, most plaintiffs testified that several white installers who had been hired after them or at the same time had advanced more rapidly. Both sides presented evidence that tended to show that whites of equal rank with blacks were given more job assignments in higher indexes. From the statistics, plus proof of subjectivity and racial incidents, we believe plaintiffs' evidence raises an inference either that blacks were not given opportunities equal to those given whites to work in higher codes or that, work opportunities being equal, whites were rated "qualified" much sooner than blacks on the average. In either case, the evidence is suggestive that whites were treated better in general.

However, since this is not a class action, each plaintiff's case under section 1981 must be examined separately in light of the statistics. The following table shows the time for advancement for each plaintiff:

| | Months to Achieve: | | |
| | Index 2 | Index 3 | Index 4 |
|---|---|---|---|
| Smith | 18 | 60 | – |
| Wright | 22 | 41 | 89 |
| Tunsill | 29 | 72 | – |
| Crawford | 22 | 114 | – |

| | Months to Achieve: | | |
| | Index 2 | Index 3 | Index 4 |
|---|---|---|---|
| L. Hodge | 22 | 40 | – |
| S. Hodge | 28 | 51 | 69 |
| Dupree | 12 | 54 | – |
| Wingard | 12 | 48 | – |
| Crump | 12 | 78 | – |
| Higginbotham | 18 | 78+ | – |
| Newsom | 18 | 60 | – |
| Bartley | 12 | 61 | – |
| Burton | 18 | 43 | – |
| Cue | 12 | 49 | – |
| McKinney | 21 | (laid off 4/75) | – |

Only Wright, L. Hodge, and Burton advanced to Index 3 approximately as fast as the average white installer. These three, therefore, have not shown discrimination in their promotions to Index 3. However, they failed to advance beyond Index 3 as fast as the average white installer. Wright had been an installer for 156 months at the time of trial, and yet whites reaching Index 5 average only 76.3 months. Wright's last promotion occurred in 1971; it advanced him to Index 4. At that time his length of service was 89 months. His white counterparts' average time to reach Index 4 was 63.8 months. Although Wright's claim for back pay based on the promotion to Index 4 is probably time barred, the statistics, when coupled with evidence of his slow advancement earlier,[31] reveal enough disparity in promotion time to Index 5 to satisfy Wright's burden to make a prima facie showing under *Green.* While Burton and L. Hodge have shown, via statistics, no discrimination in promotions to Index 3, they have established prima facie cases regarding their lack of promotion to Index 4. Burton had been employed for approximately 90 months at the time of trial without being promoted to Index 4; whites required 63.8 months to reach Index 4. Similarly, L. Hodge remained at Index 3 until his discharge in 1975. His total service with Western Electric was approximately 92 months. Burton and Hodge, therefore, have made prima facie cases regarding their lack of promotion to Index 4, since

---

**31.** Although barred by limitations, Western Electric's conduct may be relevant as an aid in interpreting *present* or nonbarred practices. *Cf. United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (proof of time-barred acts may constitute relevant evidence under Title VII). See also p. 1314, *supra.*

they proved white installers were treated better under the Index Plan.

S. Hodge advanced to Index 4 in 69 months, only 5.2 months slower than the average white. This disparity is not sufficient to raise an inference of discrimination. While his promotion to Index 3 required 10 months more than the white average, it occurred in 1972, far beyond the section 1981 statute of limitations for back pay. However, S. Hodge has been with Western Electric since February 1968, 112 months at the time of trial. His advancement to Index 4 shows that he is very competent, yet the average white installer who advanced to Index 5 required only 76.3 months. We hold that he has made a prima facie showing of discrimination in his lack of advancement to Index 5, which is not barred by limitations.

All other plaintiffs except Cue and McKinney have established a prima facie violation of section 1981, either in their promotions to current index levels, or, if those are barred by limitations, their lack of further advancement. Cue presented no evidence of specific racially motivated conduct directed toward him, and without more his advancement rate was not so slow as to raise an inference of discrimination. McKinney worked for Western Electric only three years. His advancement to Index 2 was not significantly slower than the white average, and he simply had insufficient time to achieve Index 3 before his layoff. We therefore affirm the judgment as to Cue and McKinney.

■ Thus, with the exception of Cue and McKinney, all plaintiffs established prima facie violations of section 1981 under *Green* by showing significant statistical disparity in advancement rates coupled with credible evidence of racial conduct by Western Electric's personnel. *Cf. Teamsters,* 97 S.Ct. at 1855–57 (pattern and practice suit under Title VII).

The four Title VII plaintiffs, Dupree, Smith, L. Hodge, and Tunsill, have proved prima facie cases of disparate impact as a matter of law. Dupree, Smith, and Tunsill were rated Index 3; to get there, Smith required 60 months, Tunsill 72 months, and Dupree 54 months. Whites averaged 41 months. These Title VII plaintiffs have established a prima facie case by showing that the Index Plan currently in operation freezes the status quo of prior discriminatory employment practices. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 430–31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). All three have been with Western Electric much longer than the average service time whites require to reach Index 4, yet none have reached that level. Therefore, the index system has current impact on the terms of their employment. L. Hodge, before his termination, required only 40 months to achieve Index 3. This was under the average for whites, and thus failed to establish disparate impact liability under Title VII. However, he made out a prima facie case of disparate impact by proving that he remained with Western Electric 92 months without achieving Index 4, while the average white reached that index in 63.8 months.

### Defendant's Rebuttal

#### A. Work Assignments.

Western Electric defended its procedures on several grounds. First, it insists that the incentives for supervisors to bring a job in under the budgeted number of hours preclude work assignments based on any factor other than the skills and efficiency of individual installers. The trial court accepted this contention. It stated:

> Line supervisors are given a limited period of time within which to accomplish any specific job. Their efficiency rating, which determines their income advancement, depends on their ability to perform the job within its designated time limit. The evidence, therefore, demonstrates that the line supervisors are motivated by their own self-interest to base work assignments on ability not race.

Yet we have recognized that when the supervisory force is all white:

> Blacks may very well [be] hindered in obtaining recommendations from their

foremen since there is no familial or social association between these two groups. . . . [P]romotion/transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management.

*Rowe, supra* at 359. Thus, the self interest of a supervisor would not necessarily be inconsistent with his regularly selecting whites over equally skilled blacks for work assignments in more complex codes, and perhaps the trial court weighted too heavily the evidence that efficiency and self interest were primary motivating forces.

Second, Western Electric contended, and the court below found, that "the announced policy of Western Electric to its supervisors is that their continued employment depends on their willingness to enforce the policy of the Company to treat black employees the same as any other employee. Thus, supervisors are doubly motivated to avoid discrimination based on race." Plaintiffs do not contest the existence of a comprehensive affirmative action program at Western Electric, and we agree with the trial court that such a plan tends to refute an inference of discriminatory purpose.

Third, the downturn in Western Electric's business since mid-1974 forced it to lay off on the basis of seniority large numbers of installers having low index ratings. The company thus was left with a surplus of Index 4 and 5 installers and, conversely, a shortage of work assignments in Index 4 and 5 that were available to parcel out to Index 3 installers. We agree that economic factors may have circumscribed work opportunities for all Index 3 installers, black and white, after mid-1974. The trial court's factual finding in this regard certainly is not clearly erroneous.

Raw data in the form of several hundred Form 1421's, covering the period from September 1973 through September 1976, may have contained evidence that whites received significantly more work assignments in higher codes than did blacks. However, plaintiffs failed to analyze and digest the information in the Form 1421's and thus failed to convert them into comprehensible evidence for the court. We cannot place on already overworked federal judges the burden of wading through a sea of uninterpreted raw evidence. This was a task for plaintiffs and their attorneys, and they failed to perform it.

Summarizing, we find that plaintiffs raised an inference that work in higher codes was discriminatorily assigned to whites. Defendant rebutted this evidence by proving that economic factors played a large part in reducing available work and that supervisors were ordered to assign work on a racially neutral basis. Plaintiffs might have survived this rebuttal by using direct documentary evidence of discriminatory assignments but failed to put such evidence into comprehensible form. Therefore, we hold that the trial court's finding of no racial discrimination after mid-1974 in work assignments is supported by findings of fact that are not clearly erroneous, and we concur in the court's legal conclusions.

However, the Title VII plaintiffs [32] were entitled to have the court consider acts of alleged discrimination that occurred earlier than January 1, 1974, such date being the back pay limitations date for section 1981 claims.[33] As we said earlier, liability under Title VII may accrue at any time subsequent to 180 days before each plaintiff filed his EEOC charge. Since the filings seem to have occurred around the beginning of 1973, liability may attach to acts occurring as far back as mid-1972. Additionally, proof of intent would not be necessary under Title VII. We therefore remand on the issue of discriminatory work assignments

---

32. Dupree, L. Hodge, Smith, and Tunsill.

33. Plaintiffs do not contest the statute of limitations under section 1981 that was applied by

the trial court, using Florida law; thus, we do not decide here whether the holding was correct.

for those plaintiffs. There is no evidence that the economic downturn in 1974 that the court below relied upon had any impact on available work in earlier years, and the court, after examining all the evidence, may decide that work in higher codes was discriminatorily parcelled out in 1972 and 1973. If the Title VII plaintiffs have established a prima facie case of disparate treatment *before* 1974, defendant must articulate legitimate nondiscriminatory reasons for its actions. *McDonnell-Douglas v. Green, supra*; *Turner v. Texas Instruments*, 555 F.2d 1251, 1255 (5th Cir. 1977). If statistical or other evidence regarding work assignments before 1974 shows a prima facie case of disparate *impact*, defendant must rebut by showing its particular methods are justified by business necessity. *See Garcia v. Gloor*, 609 F.2d 156, 163 (5th Cir. 1980), for an excellent discussion of various defenses under Title VII.

### B. Index Review System.

Western Electric's rebuttal also embraced a statistical analysis aimed at refuting the charge that the index review process operated discriminatorily. The trial court's holding that the review system was not racially oriented rested in part on that analysis. Although recognizing that supervisors' subjective evaluations played a role in the index reviews, the court found that the mechanics of the review procedure, the self interest of the supervisors, and statistical evidence supported its finding of no discrimination in the index reviews.

We have rejected the "self-interest" rationale and found the review procedure to be suspect under *Rowe, supra*, because of inherent dangers in such a subjective process. We also find Western Electric's statistical analysis defective for reasons stated earlier. The statistical disparities do not rebut plaintiffs' prima facie case; on the contrary, they serve to strengthen the case against Western Electric.

Western Electric also argued that examination by higher management of the outcome of each index review, coupled with the availability of grievance procedures, provided sufficient checks on supervisors who, mistakenly or intentionally, might evaluate an installer's work erroneously. Since the supervisors make no contemporary written record of their reasons for not promoting an installer or for not giving ratings of 9, however, such reasons being recorded at some later time and only if a grievance is filed, we reject Western Electric's contention. It is highly unlikely that evidence of racial animus would find its way into a record made only in response to an appeal by a black installer, even if such animus existed during the index review. After-the-fact justification allows impermissible leeway for "editing" by the supervisors responsible for the promotion decisions, and thus we find that the checks built into the system are inadequate to guard against racial discrimination.

However, Western Electric introduced testimony by supervisors regarding each plaintiff's work habits, aptitudes, and attitudes that, if credible, might serve to rebut plaintiffs' cases by proving legitimate, nondiscriminatory reasons for their slow advancement. We must remand for further findings. The trial court failed to mention much of this evidence in its opinion, possibly because it viewed the statistics as almost conclusive proof of lack of discrimination, a conclusion we have found to be erroneous. We leave to the court below the task of assessing the credibility of this and other evidence of nondiscrimination; likewise, the trial court must make the initial decision whether the credible evidence sufficiently rebuts the prima facie showings. In this circuit legitimate, nondiscriminatory reasons must be proved by a preponderance of the evidence. *Turner v. Texas Instruments*, supra.

■ Recapitulating, we find that all plaintiffs except Cue and McKinney have established a prima facie case under section 1981 regarding the index review system by showing that their advancement rates within the limitations period were significantly slower than the average white installer and by introducing evidence of their past lack of promotion and of racial language and con-

duct. Additionally, Dupree, Smith, L. Hodge, and Tunsill established prima facie violations of Title VII by showing that the index review process had a disparate impact on blacks. The trial court relied on erroneous factors in its implied finding that Western Electric rebutted the prima facie cases, and we remand to allow the court to decide whether other evidence sufficiently rebutted plaintiffs' showing.

### Attorneys' Fees

The trial court awarded attorneys' fees to both the union and Western Electric on the court's finding that the plaintiffs' claims were "without merit." A recent Supreme Court decision, handed down after the trial court's decision here, requires us to reverse and remand on this issue. *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 414 n.12, 98 S.Ct. 694, 698 n.12, 54 L.Ed.2d 648 (1978), rejected this court's reasoning, as found in *United States v. Allegheny-Ludlum Industries, Inc.*, 558 F.2d 742 (5th Cir. 1977), on the attorneys' fees issue. We had held in *Allegheny-Ludlum* that the same standards should apply to both plaintiffs and defendants in awards of attorneys' fees under Title VII, and we allowed defendants to recover as prevailing parties almost as a matter of course. The Supreme Court in *Christianburg Garment*, however, established a double standard for attorneys' fees awards. Only when plaintiff's suit is without foundation, unreasonable, frivolous, meritless, or vexatious can defendant recover attorney's fees. 434 U.S. at 419–20, 98 S.Ct. at 699–700. Defendant need not prove that the suit was brought in subjective bad faith, but "the term 'meritless' is to be understood as meaning groundless or without foundation, rather than simply that the plaintiff has ultimately lost his case." 98 S.Ct. at 700. Prevailing plaintiffs, on the other hand, should receive attorneys' fees in all but exceptional circumstances. *Id.* at 698. We recently held that awards of attorneys' fees in section 1981 cases, authorized by 42 U.S.C. § 1988, were also governed by *Christianburg Garment's* double standard. *See Lopez v. Aransas County Independent School District*, 570 F.2d 541 (5th Cir. 1978); *see also Johnson v. Mississippi*, 606 F.2d 635 (5th Cir. 1979).

The issue of the award of attorneys' fees to the union must be remanded to the trial court for findings of fact in light of *Christianburg Garment*. The court should also consider our recent opinion in *Little v. Southern Electric Steel Co.*, 595 F.2d 998 (5th Cir. 1979), (mere lack of Title VII jurisdiction, without proof that plaintiff knew his suit was barred, will not support an attorney fee award under Title VII). Regarding the award to Western Electric, we find, as a matter of law, that plaintiffs have not brought a meritless or frivolous suit. Therefore, we reverse the trial court's award of attorneys' fees to Western Electric and remand for its consideration of an award of attorneys' fees to plaintiffs. In any event, since plaintiffs have prevailed on some issues in this appeal, including the attorney fee issue, the trial court should hear evidence on reasonable attorneys' fees for the appeal and award those fees to plaintiffs. *Johnson v. Mississippi, supra* ; *Morrow v. Dillard*, 580 F.2d 1284 (5th Cir. 1978). Additionally, if plaintiffs prevail on their Title VII or section 1981 claims on remand, they should recover attorneys' fees unless special circumstances are found to exist. *Christianburg Garment Co., supra* ; *Johnson v. Mississippi, supra* ; *Lopez v. Aransas County Independent School District, supra*. In assessing such fees, the court below should consider the factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), and articulate its analysis. *Harkless v. Sweeny Independent School District*, 608 F.2d 595, 596 (5th Cir. 1979).

AFFIRMED in part and REVERSED and REMANDED in part.