**Herbert C. LINDER, Plaintiff,**

v.

**The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.**

**Civ. No. A–87–CA–834.**

United States District Court, W.D. Texas, Austin Division.

April 19, 1990.

Terry Davis, Austin, Tex., for plaintiff.

Tony P. Rosenstein, Carol R. Helliker, Baker & Botts, Houston, Tex., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WALTER S. SMITH, Jr., District Judge.

On the 12th day of March, 1990, the parties to this action, along with their counsel, appeared before the Court, and stipulated to waiving their demand for a jury. This case proceeded to trial before the Court on the 13th and 14th days of March, 1990. In accordance with the testimony and evidence presented and upon consideration of argument of counsel, the following findings of fact and conclusions of law are hereby entered.

### *Findings of Fact*

1) This is an action brought pursuant to 42 U.S.C. § 1981 in which Plaintiff alleges that he was denied promotions to sales manager because of his race.

2) Plaintiff was hired as a district agent in Prudential's Austin, Texas office on November 4, 1974. During the fifteen year period that he has worked for Prudential, Plaintiff has been a very successful agent. He has been one of the most highly compensated employees (including management) in the Austin District. During the

time relevant to this action, no sales manager in the Austin District earned as much as Plaintiff.

3) The Prudential Austin District consists of staffs of commissioned sales agents. These agents are the persons who actually sell Prudential's various insurance products. A staff is usually made up of five to eight agents and is supervised by a sales manager. The sales managers report to the District Manager. The Austin District was comprised of four or five sales staffs (depending on the year).

4) Joe Gresham became the Austin District Manager in about 1983 and continued in that position until his retirement in December of 1987. As District Manager, Mr. Gresham was in charge of the operation of the Austin District. Among his duties was the responsibility for recommending persons for promotion to sales manager in that area.

5) Mr. Gresham testified that prior to 1985, he was not aware that Plaintiff was interested in the sales manager job and he had no such position that would have paid Plaintiff anywhere near the compensation he was earning as an agent. In fact, from November, 1983 to May, 1984, the sales manager position for Staff D in the Austin District was vacant. Mr. Gresham asked several Prudential employees in the Austin District, including Plaintiff, if they knew of anyone who wanted the sales manager position. No one seemed interested in the position, and Plaintiff never indicated that he wanted the job. Finally, on May 21, 1984, Mr. Rathke took the position.

6) During 1985, Plaintiff told Mr. Gresham that he wanted to be promoted to sales manager. A few months later, in September of 1985, Mr. Gresham offered Plaintiff a promotion to sales manager. At that time, Mr. Gresham was planning to demote or transfer the sales manager of Staff J so he knew that there would soon be a vacancy on that Staff. Mr. Gresham did not offer Plaintiff the sales manager position of Staff D, which was filled by Mr. Benefield in September, 1985, because he wanted to offer Plaintiff the sales manager position of Staff J. Plaintiff's own agency

was on this Staff, and Joe Gresham viewed this as an advantage since Plaintiff could introduce a new agent to his policyholders and other business contacts. In addition, Mr. Gresham testified that Staff J was better than Staff D at that time. When Mr. Gresham offered the position to Plaintiff, Plaintiff asked to see the figures on the level of income the position would generate. Mr. Gresham called the home office to obtain this information. When Mr. Gresham received the compensation figures from the home office, he went over them with Plaintiff.

7) At Prudential, experienced district agents are compensated on a pure commission basis. Thus, their income is related only to the amount and type of the various insurance products they are able to sell and service. The sales manager, on the other hand, receives no significant personal commissions for new business that is sold. Rather, his income is a function of the commissions generated by the agents on his staff. The commission overrides paid to the sales manager will allow him to earn somewhat more than the average income of an agent on his staff. However, the management increment will not permit the sales manager to earn as much as an agent like the Plaintiff with extraordinarily high production.

8) For the first two years after an agent is promoted to sales manager, Prudential provides a guaranteed level of income. That is, for the first two years after promotion, a sales manager's compensation will be based upon the commissions generated by the agents reporting to him; however, if the level of income so generated falls below the guarantee or subsidy amount, Prudential will make up the difference.

9) In September, 1985, when Plaintiff was offered the sales manager promotion, the subsidy amount was $600.00 per week. This was not quite 50% of what Plaintiff had been making as a district agent. Therefore, unless he could manage the staff so well that it would generate commissions in excess of the subsidy amount, he would suffer a substantial loss of in-

come as a result of the promotion. It thus became important to know what the prospective sales staff was likely to generate in commissions, and this was part of the analysis engaged in by Plaintiff and his District Manager.

10) Based on the figures provided by the home office, the staff for which Mr. Gresham anticipated a vacancy in the sales manager position was not then producing in excess of the subsidy. Thus, had he accepted the offer of promotion, Plaintiff's initial level of compensation would have been substantially reduced over what he enjoyed as an agent.

11) Plaintiff and Mr. Gresham also discussed the possibility of a corporate exception to the $600.00 subsidy. Company policy provides for such exceptions when both the candidate for promotion and the staff meet certain qualification and production requirements. Neither Plaintiff nor the staff met the criteria for a corporate exception to the normal $600.00 subsidy. In the case of the sales staff, the principal requirement was that the staff average commission for an extended period of time exceed certain threshold limits required for an increased subsidy. In addition to the staff production requirement for an exception to the sales manager pay plan, the sales manager candidate himself had to fulfill certain prerequisites. One of these was the passing of a NASD (National Association of Security Dealers) test and associated licensure. Plaintiff testified that he failed this test on three or four occasions and did not finally pass it until mid-1987. None of the Austin staffs met the threshold requirement for an exceptional increase in the sales manager subsidy, and none of the sales managers promoted in the Austin District from 1985 until Mr. Gresham's retirement at the end of 1987 received more than the normal subsidy amount.

12) Plaintiff told Mr. Gresham that he would accept the sales manager job only on the condition that he be granted a guarantee of $1,000.00 per week, rather than the $600.00 provided by company policy. Mr. Gresham informed Plaintiff that it was not possible to deviate from company policy for any one individual but the Plaintiff was welcome to the promotion under the same conditions as would have been applied to any other sales manager. Plaintiff declined the offer, reiterating that he would accept it only if the guarantee was raised to $1,000.00 per week. Therefore, Plaintiff did not take the job and it was, sometime later, filled by another employee in the normal subsidy level.

13) The September, 1985 transaction was the subject of particular controversy at trial. Plaintiff admitted that his manager explored the sales manager position with him, but he claimed that an actual offer of promotion was not made. Defendant claims that an offer was made but that Plaintiff was unwilling to accept it under the conditions which would have been applicable to any agent regardless of race. This is a matter not only of credibility but of interpretation of conversations that concededly took place. The Court credits Defendant's account for the following reasons.

First, the fact that Joe Gresham ordered the documents to accomplish a promotion is consistent with his intention to offer the position to Plaintiff. Moreover, Mr. Gresham ordered documents in an attempt to qualify Plaintiff for exceptional compensation treatment. Second, Mr. Gresham's letter written prior to the filing of the lawsuit is consistent with his testimony. Third, the testimony of Frank Astolfi, Prudential's Chief Executive Officer in the region, supports Mr. Gresham's statement of intent, as does the testimony of Richard Bonner, Vice President, Regional Manager. Mr. Gresham's contemporaneous notes of the conversation also support the other evidence of the transaction. Finally, Plaintiff's refusal of the position in 1985 is consistent with his conduct when offers were repeatedly made on subsequent occasions.

14) For approximately eighteen months after September, 1985, as far as Mr. Gresham knew, Plaintiff's position (that he would only accept a promotion to sales manager if the guarantee was raised to $1,000.00 per week) had not changed. Since Mr. Gresham never had any sales

manager vacancies that would have yielded this level of guaranteed income, he did not offer any specific promotion to Plaintiff during that time. Thus, Mr. Gresham did not offer Plaintiff the position of sales manager of Staff D in April of 1986, which was filed by Mr. LaBanca, the position of sales manager of Staff J in June of 1986, which was filled by Mr. Benton, or the position of sales manager of Staff J again in March of 1987, which was ultimately filled by Mr. Olson. Had Plaintiff come to Mr. Gresham and told Mr. Gresham that he wanted one of these jobs at the normal subsidy level, Mr. Gresham testified that he would have promoted him immediately.

15) Plaintiff also complains about not being promoted to sales manager of Staff I in May, 1985 or to sales manager of Staff C in October of 1986. However, both of these positions were filled by sales managers who transferred from other districts.

16) In early 1985, the sales manager position for Staff I in the Austin District came open. Calvin Reeves was transferred to the position. Mr. Reeves had previously been a manager in Austin and was reassigned to a sales manager in Lafayette, Louisiana. When Mr. Reeves learned that the sales manager of Staff I was being promoted, Mr. Reeves requested that he be transferred back to Austin for personal reasons. These included primarily the fact that Mr. Reeves' wife was diagnosed as having cancer. She wanted to return to Austin and was "terrified" of remaining in Lafayette which had one of the highest cancer rates in the country. Prudential understandably accommodated Mr. and Mrs. Reeves.

17) In October, 1986, the sales manager position for Staff C became vacant. When Mr. LaCagnina, a former District Manager and sales manager in the Austin District, learned of this, he asked to be transferred to the position. In order to transfer, Mr. LaCagnina had to obtain the permission of his own district manager, the home office and the Austin District Manager. Mr. Gresham testified that he was anxious to have LaCagnina as one of his sales managers because of his previous performance and credentials. This position was not offered to any sales agent, it was not an available vacancy for promotion. Moreover, this position would have paid less than Plaintiff's stated minimum requirement. In fact, LaCagnina took the job at a level of compensation substantially below that of Plaintiff. His income is included among those in DX–7 which was well below that of the Plaintiff throughout the time relevant to this action.

18) Thus, with regard to the Reeves and LaCagnina positions, the Court finds that these were not promotional vacancies or opportunities available to any sales agent, and the failure to offer these positions to Plaintiff was not related to his race. In addition, based upon the evidence and uncontroverted testimony of Joe Gresham regarding the prior experience of Mr. Reeves and Mr. LaCagnina, the Court finds that these individuals were better qualified for the position of sales manager than the Plaintiff.

19) In the spring of 1986, Plaintiff met with Prudential's Vice President of District Agencies, Frank Astolfi. Mr. Astolfi testified that at this meeting, he told Plaintiff about Mr. Gresham's expressed desire to promote Plaintiff but that Plaintiff had told Mr. Gresham that he could not take the job or even consider it without many financial guarantees. Mr. Astolfi congratulated Plaintiff on his past performance as an agent and mentioned that sometimes one had to take a side or backwards step in one's career financially to ultimately show big economic and personal gain. Mr. Astolfi briefly reviewed with Plaintiff the sales manager pay plan. Plaintiff indicated that he wanted more than the pay plan could pay. Mr. Astolfi encouraged Plaintiff to continue doing a great job as an agent and told him that if he felt that he wanted to be a sales manager to let his District Manager know but be prepared for the pay plan as it would affect him. Thus, in the Spring of 1986, it was again made clear to Plaintiff that Prudential wanted to promote him if he would accept a sales manager job under the same conditions as would have been applicable to any other employee.

20) In the Spring of 1987, Plaintiff filed an EEOC charge complaining of Prudential's failure to promote him to sales manager. In view of the previous transactions, this came as a surprise to Prudential's management. It seemed to indicate that either there had been a misunderstanding or that Plaintiff might be more inclined to accept a promotion.

21) Mr. Gresham testified that in September of 1987, he again offered Plaintiff a promotion to sales manager of Staff J. Mr. Gresham informed Plaintiff the company subsidy had been raised to $800.00 per week. Mr. Gresham went over the sales manager compensation information with Plaintiff. The figures showed that, like two years previously, Plaintiff was still enjoying an exceptionally high level of commission income as an agent and a sales manager promotion would have represented an initial decline in compensation. At the end of their meeting in September, 1987, Plaintiff indicated to Mr. Gresham that he was not interested in the position because he felt that the $800.00 per week subsidy was less than he could accept based on his current earnings.

22) Three months later, in December, 1987, Mr. Gresham told Plaintiff that he was considering a realignment of two of the sales staffs, Staffs J and D, and asked Plaintiff if he would consider the Staff J position. Plaintiff indicated that if the alignment of agents on the staff could be changed, he would consider the promotion. In particular, Plaintiff wanted to include two agents, Dave Allen and Richard Carroll on Staff J. A short time later, Mr. Gresham informed Plaintiff that he had successfully realigned the staffs the way Plaintiff desired and asked him if he would accept the promotion. Plaintiff told Mr. Gresham that he would consider the offer. A few days later, on December 18, 1987, Mr. Gresham retired.

23) On the same day that Mr. Gresham retired, Richard Bonner, Vice President–Regional Manager and Mr. Gresham's superior, met with Plaintiff in Austin to discuss the promotional opportunity. Mr. Bonner testified that they went over the proposed staff changes that would create Staff D and Staff J. Mr. Bonner explained to Plaintiff that Larry Graham was being considered as sales manager for Staff D and discussed with Plaintiff the fact that Larry Graham would probably want to have three new agents that he had recruited on his staff. Plaintiff indicated there was no problem with that arrangement and that the staff letter (either Staff J or Staff D) did not matter to him.

24) Mr. Bonner urged Plaintiff to consider the opportunity and assured him that the agents he had requested would be placed on the staff. Mr. Bonner indicated that it was a good opportunity if Plaintiff wanted a promotion to sales manager. Mr. Bonner also told Plaintiff that although the normal sales manager subsidy was $800.00 per week, he would apply for a corporate exception to raise it to $1,000.00 and felt the chances were good that this request would be granted. Plaintiff informed Mr. Bonner that he would consider the offer and that he wished to discuss it with his attorney. Mr. Bonner said that was fine but he needed to have Plaintiff's decision in writing within one week.

25) Mr. Bonner did not receive a response from Plaintiff until around December 28, 1987 when he received an undated letter from Plaintiff. Mr. Bonner testified that in the letter, Plaintiff did not address the sales manager position at all but stated that Plaintiff was willing to accept a promotion to the higher level job of District Manager. Mr. Bonner was somewhat confused by this response since he and Plaintiff were well aware that the district agents are not generally promoted directly to District Manager.

26) On January 4, 1988, Mr. Bonner contacted Plaintiff and explained to him that he could not be considered for the District Manager position since a promotion to the District Manager slot is filled by someone in the sales manager position or someone who has been both a sales manager and Assistant to the Vice President. Mr. Bonner reiterated his offer of the sales manager job that they had discussed the previous month. Plaintiff indicated that he wanted

to think about it. Plaintiff never responded to this offer.

27) Mr. Bonner testified that if Plaintiff had taken the position of sales manager in Staff J as offered to him in December, 1987 and January, 1988, he would have been the sales manager of the leading Staff in the Austin District.

28) In November, 1988, Plaintiff's new District Manager, Jim Stringfellow, offered Plaintiff another promotion to sales manager of Staff J. Mr. Stringfellow and Plaintiff met on November 14, 1988 to discuss the corporate subsidy. Mr. Stringfellow indicated that the guarantee for Staff J would be $800.00 weekly but that he felt he could get corporate to approve a $1,000.00 weekly limit. Plaintiff once again rejected the promotion which was offered to him.

29) Mr. Stringfellow testified that in the Summer of 1989, he thought that a sales manager position was going to become vacant. Mr. Stringfellow told Plaintiff this and indicated that he would like to promote Plaintiff to this position. Unfortunately, the sales manager position did not become vacate so Plaintiff could not be promoted. However, this demonstrated Prudential's continuing desire to promote Plaintiff to sales manager.

30) There are several disputes in the case involving credibility. Some of the more significant ones follow:

  a) Plaintiff disputes the testimony of Joe Gresham to the effect that Plaintiff would not accept a sales manager position in 1985 unless the guarantee were specially increased to $1,000.00 per week in spite of established policies to the contrary.

  b) Plaintiff disputes the testimony of Frank Astolfi, Prudential's Vice President of District Agencies, regarding a conversation in the spring of 1986. Plaintiff specifically disputes Mr. Astolfi's testimony that he told Plaintiff that his District Manager, Joe Gresham, wanted to promote him to sales manager, and that he was unwilling to accept the normal subsidy under the sales manager pay plan.

  c) Plaintiff disputes the testimony of Richard Bonner, Vice President, Regional Marketing, in regard to various aspects of the conversations surrounding Prudential's offer of a sales manager position to Plaintiff in late 1987 and again, in early 1988.

With regard to the above-described disputes, the Court finds that Prudential's evidence is more credible and consistent than that of the Plaintiff. After carefully reviewing the documentary as well as testimonial evidence, the Court credits the testimony of Messrs Gresham, Astolfi and Bonner over that of the Plaintiff.

31) A primary focus of Plaintiff's case is his contention that this district manager, Joe Gresham, was actuated by discriminatory animus. Mr. Gresham testified at considerable length in this case, and his actions were subject to detailed scrutiny by the Court and searching cross-examination by Plaintiff's skillful trial counsel. Mr. Gresham's testimony was characterized by both consistency and common sense. Both through his own testimony and the testimony of his superiors, Mr. Gresham appeared to be a particularly competent District Manager for Prudential. There is absolutely no evidence of discriminatory animus on his part. Rather, the Court finds that Mr. Gresham viewed the Plaintiff as a very valuable district agent whose services he desired to retain. In fact, there were several instances of Mr. Gresham going out of his way to further the interests of Plaintiff. Moreover, when the Plaintiff did express a desire for promotion, Mr. Gresham responded reasonably and intelligently to the request.

32) As the facts show, Plaintiff had a number of opportunities to become a sales manager but he repeatedly rejected them. Prudential has been willing and is willing today to promote Plaintiff to the position of sales manager. Plaintiff has rejected these offers because it would result in a temporary reduction in income. The decision has at all relevant times been Plaintiff's and has not been influenced by his race.

33) The actions of Prudential's management were inconsistent with an hypothesis

of racial discrimination. At least four managers and three levels of management were represented during the trial of this action, and these individuals have consistently encouraged Plaintiff to pursue a sales manager position if that is what he desires. Prudential's conduct with regard to this matter is reflective not of discrimination, but rather of a healthy respect and solicitude for its employees of all races. This is a company that, the Court finds, was genuinely desirous of promoting this minority employee to the position of sales manager.

34) There is a substantial question as to whether Plaintiff suffered any damage in connection with his claims. He certainly did not suffer any pecuniary damage through deprivation of any promotion made during the relevant time period. DX-7 demonstrates that Plaintiff made more money than all the sales managers, and even the district managers, during the years 1986 through 1989. Moreover, there would certainly be no predicate for injunctive relief as Prudential has demonstrated its continued willingness to promote Plaintiff. The Court cannot help but note how many times the Plaintiff has declined opportunities for promotion when they were presented to him. Given this predicate conduct, an employer could reasonably conclude that the sales manager position under normal company policy was not acceptable to Plaintiff. The employment discrimination laws do not require an employer to engage in futile gestures, and while Plaintiff has a right to future promotions if he is the most qualified candidate, it is also reasonable to expect him to take the initiative in evidencing a willingness to take the jobs under the same conditions as would apply to any other employee.

35) Any finding of fact which should more appropriately be a conclusion of law is deemed so.

### Conclusions of Law

1) The Court has jurisdiction over the parties and subject matter in this case.

2) A claim under 42 U.S.C. § 1981 requires a showing of purposeful discrimi-

nation. *Crawford v. Western Electric Company*, 614 F.2d 1300, 1309 (5th Cir. 1980); *Grigsby v. North Mississippi Medical Center, Inc.*, 586 F.2d 457, 460–61 (5th Cir.1978) (on reh'g). In an individual case of employment discrimination, the burden of proof and persuasion under 42 U.S.C. § 1981 is the same as in a case brought under Title VII, 42 U.S.C. § 2000e, et seq. *Whiting v. Jackson State University*, 616 F.2d 116 (5th Cir.1980). Thus, proof of discriminatory motive is critical to Plaintiff's case. *Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Wilson v. Sealtest Foods Division of Kraftco Corp.*, 501 F.2d 84, 86 (5th Cir.1974).

3) Plaintiff's claim represents and constitutes a "disparate treatment" case governed by the standards set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

4) Plaintiff must establish that "but for" his race, he would have been promoted to sales manager. *Jackson v. City of Killeen*, 654 F.2d 1181, 1186 (5th Cir.1981). Plaintiff must establish a prima facie case of showing "Actions ... from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on discriminatory criterion illegal under the Act.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) and *see Massarsky v. General Motors Corp.*, 706 F.2d 111, 118 (3rd Cir. 1983), cert. denied, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). Plaintiff cannot establish a prima facie case unless he shows acts which, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Corp.* 438 U.S. at 577, 98 S.Ct. at 2949.

5) To establish a prima facie case of promotion discrimination, Plaintiff must prove: (1) he belongs to a protected group; (2) that he applied for and was qualified for

the vacancy; (3) that despite his qualifications, he was rejected; and (4) that after his rejection the position remained open and the employer continued to seek applications from persons of similar qualifications. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

[redacted] 6) If Plaintiff is able to fulfill the requisites of a prima facie case under *McDonnell Douglas,* then the Defendant bears the burden of articulating a legitimate, nondiscriminatory reason for the action taken. Defendant's burden is one of production and not of proof. *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). If Defendant meets its burden of production, Plaintiff may succeed only by proving that the reason given is a pretext or cover up for discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The ultimate burden of persuasion rests with the Plaintiff to persuade the Court that he has been the victim of intentional discrimination. *Jackson v. City of Killeen,* 654 F.2d 1181, 1185 (5th Cir.1981).

[redacted] 7) Under the employment discrimination laws an employer's action, if based upon a sincere belief in its business justification, is not subject to attack even if the court should conclude that the action was erroneous, so long as it was not motivated by discriminatory animus. *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1255–56 (5th Cir.1977).

[redacted] 8) Under *Patterson v. McLean Credit Union,* — U.S. —, 109 S.Ct. 2363, 2378 at n. 7, 105 L.Ed.2d 132 (1989), Plaintiff may maintain an action, at most, for the deprivation of *available* positions. However, Plaintiff's consistent conduct throughout the time relevant to this case and, indeed, through the present, demonstrates that he was unwilling to take the sales manager position as it was and would have been available to others regardless of race.

9) It is problematical whether Plaintiff has made out a prima facie case because, under the peculiar facts of this case, it is arguable that he did not really apply for any promotional vacancies, nor was he rejected; to the contrary the opportunities were manifestly available to him. However, assuming arguendo that Plaintiff has established a prima facie case, Defendant has articulated a legitimate, nondiscriminatory reason for its actions as described herein.

[redacted] 10) Moreover, there is no evidence that Defendant's failure to promote Plaintiff was a pretext for discrimination. Defendant repeatedly offered to promote Plaintiff to sales manager but Plaintiff rejected the offers. From September of 1985 until the Spring of 1987, Defendant did not offer to promote Plaintiff because Plaintiff had indicated that he would not accept a promotion under the normal conditions applicable to all employees regardless of race. Thus, Prudential believed that Plaintiff was not a candidate for these positions by his own choice. Defendant appears to have been correct, but even if it were not, it was motivated by sincerely held business-related concerns. Plaintiff has failed to satisfy his burden of proving that the has been the victim of intentional discrimination based on his race.

11) Any conclusion of law which should more appropriately be a finding of fact is deemed so.