[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 19, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12226

_____

D. C. Docket No. 02-01145-CV-CAP-1

AYANNA HARRINGTON,
CHEYNE HARDIN,
TAJI NANJI,
LAQUANDA PLANTT,
SANTRICE LANEY,
ROBERT NATHAN MARX,

Plaintiffs-Appellants,

versus

DISNEY REGIONAL ENTERTAINMENT, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(October 19, 2007)**

Before PRYOR, KRAVITCH and ALARCÓN,[*] Circuit Judges.

PER CURIAM:

Cheyne Hardin, Ayanna Harrington, Santrice Laney, Taji Nanji, and Laquanda Plantt (collectively "appellants") appeal the district court's adoption of the magistrate judge's Report and Recommendation granting summary judgment to appellees Disney Regional Entertainment, Inc. and Zone Enterprises of Georgia, Inc. (together "ESPN Zone").[1]  Appellants sued ESPN Zone alleging racial discrimination based on disparate treatment and hostile work environment discrimination in violation of 42 U.S.C. § 1981.  In addition, Robert N. Marx, attorney for appellants, appeals the district court's imposition of sanctions pursuant to 28 U.S.C. § 1927.  After a thorough review of the record and arguments, we affirm the district court's orders regarding summary judgment and the sanctions.

## I.  BACKGROUND

A.  General Operations of ESPN Zone

Appellants all worked at ESPN Zone, a restaurant and entertainment center. Nanji worked as a busser cleaning tables and later as a server; the other four appellants worked as servers.  Servers were assigned to work shifts in one of four

---

[*]  Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1]  Because the district court adopted all of the magistrate's recommendations, we refer to the magistrate's actions throughout this opinion.

dining rooms: the Studio Grill, the Screening Room, the Bristol Suite, and the Patio. The Screening Room and Bristol Suite were considered by appellants to be more lucrative assignments because those sections were most often busy and the tips were higher. Managers were responsible for assigning servers to their respective sections.

Servers were paid $2.13/hr plus tips. Servers who trained other servers were paid $3.13 per hour while working serving shifts and $10 per hour teaching training classes. Servers had to give two percent of their total tips to the bussers. Bussers were paid $5.15/hr plus their share of the servers' tips. Bartenders were also paid $2.13/hr and did not have to share their tips. Training servers also received complimentary meals while training and parking passes if they owned a car. To become a training server or receive any other promotion, employees had to submit a letter of interest to management. Becoming a trainer and other promotions were called "transfers," and ESPN Zone's written policy prohibits any transfers until the employee has worked for ninety days.

ESPN Zone had a written anti-discrimination policy. The restaurant had three different employee guides that concerned equal employment and sexual harassment policies. The guides instructed employees to report any perceived violations—including the use of racial slurs—to superiors or the Human Resources

3

Department. Appellants received copies of these manuals. Arnold Sye, ESPN Zone's Human Resources Manager during the relevant time period, admitted during his deposition that ESPN Zone had difficulty applying its policies consistently when the restaurant first opened in January 2000 but was adamant that the inconsistencies were not due to racial discrimination.

Managers of ESPN Zone maintained "contact" sheets for each employee where they recorded disciplinary infractions (such as tardiness or missed shifts), positive feedback, and other information regarding an employee's performance. The magistrate judge relied on these contact sheets when evaluating the performance of each appellant.

B. Alleged Discrimination

Appellants allege that they suffered from disparate treatment and a hostile work environment on account of their race. Because each appellant bears the burden of proving that he or she suffered discrimination based on race, each appellant's work history at ESPN Zone is described in turn.

1. *Chyene Hardin*

Hardin, who is African-American, was hired when ESPN Zone opened in January 2000. She was never disciplined and had positive evaluations from management, although management did not believe her to be a strong enough

4

server to be a trainer server. She applied to be a trainer server in February or March 2000 but was told that no more trainers were needed.

She was called "a lazy nigger" by a co-worker, Robert Mullhare, who was later forced to apologize by management. Hardin testified that she never heard any manager make a racist comment.

Hardin claims that she once was not allowed to leave work when she had severe stomach cramps. Nothing came of this complaint. She quit working at ESPN Zone in June 2000 because she "just got tired of working there."

*2. Ayanna Harrington*

Harrington, who is African-American, began working as a server at ESPN Zone on June 10, 2000. She worked until October 30, 2000 when she submitted her letter of resignation declaring that she was unable to continue to work at ESPN Zone because of the discrimination she suffered.

Harrington applied to be a bartender before she had been employed for ninety days and did not receive the transfer; however, Ruth Heinzman, who is white, also applied before her ninety day probationary period was finished and she, unlike Harrington, was hired. ESPN Zone alleges that Heinzman had bartending experience while Harrington did not.

Harrington's contact sheets reveal that she was late for work five times from

5

July through October 2000, although she vigorously disputes the accuracy of these records. She also received a negative "contact" for "slacking on sidework duties; not respecting chef or shift captain." But Harrington also received four positive contacts for working additional shifts and extra effort. Once, Harrington was called into work when her previously-arranged replacement failed to show. But Harrington was sent home after she arrived at work because the replacement had arrived.

In September, Harrington was accused of calling a sous chef "nigger." She denies saying it, but admits that she said "O.K negro—my bad Black man, I'll go get her." A week after this incident Harrington sent a letter to ESPN Zone's corporate headquarters complaining of racial discrimination. Management acknowledged receiving the letter and that its policy required an investigation, but it is unclear if an investigation ever occurred.

In October 2000, Harrington was sent home from work after a co-worker reported to a manager that Harrington "did not like serving white people." She was suspended while the comment was investigated though ESPN Zone. Harrington contacted a local chapter of the NAACP who contacted ESPN Zone on her behalf. ESPN Zone subsequently contacted Harrington and informed her the suspension was in error and that she would be compensated for her lost wages and

was not disciplined further.

Sometime near the end of her employment, Harrington claims that managers Jason Beudert and Brian LeFils "cornered" her in an doorway entrance and told her they wanted to see her in the office. She felt threatened by the situation because "voices were raised and they did not step back until she screamed for a third time." The men did not touch her, but Beudert later apologized and said they were not trying to hurt her.

During her employment with ESPN Zone, Harrington overheard Bobby Zapf, a manager, tell several black bussers that they "looked like a bunch of monkeys." Harrington asked what he meant by that, and Zapf said, "It's not like that, Ayanna, don't take it that way. They just look like a bunch of monkeys." Harrington also testified that several white colleagues as well as Rob Lanier, a manager, referred to her and another appellant, Laney, as "ghetto."[2]

Harrington resigned in October 2000. She claims that her resignation was prompted by Tom Rose, another supervisor, who yelled at her for smoking at the back of the restaurant with co-workers even though she had been given permission to take a break by another manager. She claims she was threatened with a "contact," but the record shows she was not disciplined.

---

[2] The evidence shows that "ghetto" was slang often, if not exclusively, used to refer to African Americans. From the context of this suit, it is apparent that the term is used as a slur.

### 3. Santrice Laney

Laney, who is African-American, began work at ESPN Zone in June 2000 as a server. Before her ninety day probationary period was up, she—like Harrington—expressed interest in a bartending position. She did not have any bartending experience and was not chosen to be a bartender.

Laney heard several servers refer to guests as "ghetto," but acknowledged that management instructed the staff not use any racially-loaded language, including the term "ghetto." Laney overhear manager Zapf tell two busboys to "go through the door that [is] the same color as your skin." She also heard Zapf refer to the bussers as monkeys. She admits that she never heard slurs directed at her.

Laney had significant disciplinary problems, receiving approximately twenty negative contacts concerning attendance and disrespect towards co-workers and guests, although she also received several positive contacts. She was suspected of theft in December or January 2001 and terminated after failing to meet with the general manager about the accusation.

### 4. Taji Nanji

Nanji, who is African-American, applied for a server position in December 1999. He was told there were none available but was offered a position as busser with the proviso that he could cross-train as a server after his ninety-day probation

8

period. After his first three months, he was promoted to busser trainer with a $1 per hour pay increase. He claims he regularly sought to be promoted to server but was told that he was needed as a busser. He had a very positive contact sheet as a busser and was given a monthly award.

In December 2000, he was told he could train as a server but decided not to do so because his wife was severely ill. He finally began training as a server in June 2001. His performance evaluations, however, were below average, and he was taken off the schedule and told he needed to be retrained in February 2002. Instead, he resigned, stating that his wife was still ill and he "could not take the situation anymore."

In his deposition, Nanji testified that he resigned because of the unfair racial practices at ESPN Zone. Nanji explained that he was told he looked like a monkey by Zapf, who later apologized. Nanji often heard the term "ghetto." He also mentioned that he was present when Mullhare asked another co-worker "what's up my nigga" and that Mullhare used "the 'N' word every now and then."

5. *Laquanda Plantt*

Plantt, who is African-American, was hired in January 2000 as a server and sought to be a trainer server the next month. The HR manager, Sye, told her that he did not think she was capable of being a trainer server and later testified that he

did not assign Plantt training duties because of her chronic attendance problems. She was given eleven negative contacts and three positive contacts in the nine months she worked at ESPN Zone.

Plantt alleges that she was once denied permission to leave work even though she was ill and that she once was forced to work on the patio despite having a doctor's note stating that she should not work in the sun. In September, Plantt was involved in an incident with a new, white server that deteriorated into yelling back and forth. Plantt claims that a manager intervened and threatened to fire her, but not the other server. No record of this incident exists.

Plantt testified that she heard a co-worker, Mullhare, call appellant Hardin "a lazy nigger." This was the only time she heard the word "nigger," but Plantt heard staff using the word "ghetto." She was never called any racial slurs.

It is unclear why Plantt left ESPN Zone but her last date of work was in September 2000.

C.     Marx's Sanctions

Appellants' attorney, Robert N. Marx, was sanctioned by the district court for his conduct concerning the attempted deposition of non-party witness Marcus Bailey on April 1, 2004. On March 17, 2004, during discovery regarding this underlying action, Marx faxed notification to appellees' attorneys that he would be

noticing Bailey's deposition for April 1, 2004 if that time was agreeable for opposing counsel. Later that same afternoon, Marx learned that another of his trials was rescheduled for April 1. Marx did not notice Bailey's deposition. On March 25, having no further contact with Marx, counsel for ESPN Zone noticed the deposition for April 1 and subpoenaed Bailey to appear. Marx never informed counsel of his other obligation and failed to appear at the April 1 deposition. Both Bailey and ESPN Zone counsel did appear, but ESPN Zone counsel ended the deposition after Bailey mistakenly claimed he was a plaintiff in the case and Marx was his attorney.

On April 15, ESPN Zone counsel again noticed Bailey for a deposition on April 27. Marx attended this deposition but Bailey did not. Speaking with Bailey by phone, Marx informed ESPN Zone counsel that Bailey did not attend because of financial hardship. ESPN Zone counsel had failed to pay the necessary third-party witness and mileage fees for either deposition.

On May 30, ESPN Zone's counsel moved to compel Bailey's appearance or exclude his testimony including striking all references to him from the complaint, and also sought sanctions against Marx for failing to appear on April 1. Marx opposed ESPN Zone's motion, arguing that both depositions were defective

11

because they did not include the appropriate fees for Bailey; Marx also noted that Bailey had indicated he would be willing to be deposed.

The district court denied exclusion of Bailey's testimony, ordered Bailey deposed, and sanctioned Marx for not notifying opposing counsel of his inability to attend the first deposition and for his opposition to the motion to compel.

## II.  STANDARD OF REVIEW

We review summary judgment orders de novo.  Gibson v. RTC, 51 F.3d 1016, 1020 (11th Cir.1995).  We view all evidence and make all factual inferences in the light most favorable to the non-moving party.  Danskine v. Miami Dade Fire Dep't, 253 F.3d 1288, 1293 (11th Cir. 2001).

We review a district court's adoption of a magistrate's evidentiary decisions for abuse of discretion.  "Abuse of discretion exists if the district court made a clear error of judgment . . . or . . . applied an incorrect legal standard."  Millennium Partners, L.P. v. Colmar Storage, LLC, 494 F.3d 1293, 1301 (11th Cir. 2007) (quotation and citation omitted).  And we review the district court's imposition of sanctions under 28 U.S.C. § 1927 for abuse of discretion.  Schwartz v. Millon Air, Inc., 341 F.3d 1220, 1225 (11th Cir. 2003).

## III. DISCUSSION

The adopted Report and Recommendation divided appellants' employment discrimination claims into three categories: (1) disparate pay claims, relying on pattern and practice evidence; (2) disparate treatment claims regarding denied promotions; and (3) hostile work environment claims. The magistrate determined that no appellant satisfied his or her burden of proof under any claim. As part of his analysis, the magistrate determined that several statements and documents offered by appellants were inadmissible. The district court adopted the magistrate's Report and Recommendation in full and also affirmed in a separate order the § 1927 sanctions against attorney Robert Marx.

On appeal, appellants argue that the district court erred in granting summary judgment on the employment discrimination claims and abused its discretion in excluding the disputed evidence and ordering the sanctions. We address each issue below.

As a threshold matter, appellants claim that the district court failed in its statutory obligation to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made," 28 U.S.C. § 636(b)(1), because the district court did not specifically

13

mention that it reviewed the entire record.  We disagree. The district court, in its order adopting the magistrate's Report and Recommendation, stated

> After carefully considering and conducting a de novo review of the report and recommendation of the magistrate judge and the voluminous objections made by the plaintiffs and the defendants, the courts receives it with approval and ADOPTS it as the opinion and order of this court.

This language tracks the required review under § 636(b)(1) and gives us no cause to doubt that the district court complied with its statutory obligation.

A.  Evidentiary Issues

The district court adopted the magistrate's recommendations to exclude several statements and documents offered by appellants as inadmissible.

### 1.  The Pope Report and Notes

ESPN Zone commissioned a consulting firm in the fall of 2000 to review its management practices regarding diversity training.  The firm, Pope & Associates, submitted a two-page report based on interviews with management at ESPN Zone. The Pope Report, as it is called by the parties, was critical of ESPN Zone's handling of issues regarding diversity.

The magistrate refused to consider the Report or any notes used in its creation because it was not authenticated pursuant to Rule 56(e) and, furthermore, much of the report was inadmissible hearsay.

We do not find it necessary to determine whether the Pope Report and related notes were properly authenticated through production because they remain inadmissible hearsay.[3] Although appellants contend that the Pope Report and notes are admissible as adoptive admissions under Federal Rule of Evidence 801(d)(1)(2)(B), this argument is unpersuasive. The magistrate was well within his discretion in concluding that ESPN Zone's alleged response to the Pope Report – implementing diversity training and related measures – did not constitute an adoption or endorsement of its truth, since there was credible testimony that ESPN Zone intended to implement diversity training before the Pope Report was prepared and indeed, hired Pope & Associates in part for the purpose of implementing such training effectively.[4]

Appellants argue, in the alternative, that the Pope documents are admissible under the hearsay exception for business records. Fed. R. Evid. 803(6). This exception is inapplicable. The Pope Report and accompanying notes were created

---

[3] Appellants argue that the magistrate only excluded portions of the Pope Report on hearsay grounds and relied on the lack of authenticity to exclude the Report as a whole. Nevertheless, the entire report is hearsay because the Report is a summary of statements made by ESPN Zone employees to the Pope consultants.

[4] Even if the Report and notes were erroneously excluded, the error would be harmless. The Pope Report and related notes do not specify any acts of discrimination or identify any individuals who acted in a discriminatory manner. The Report itself consists of generalities and highly abstract recommendations for improved management, and thus is of extremely limited probative value. Viewed in conjunction with the other evidence in the case, the Report, even if admitted, would not create any triable issue of fact.

15

by outside consultants in the course of a special investigation. Appellants presented no evidence regarding the creation of the notes and so failed to meet the requirement of Rule 803(6) that a document be kept in the regular course of business. The Report itself is inadmissible for the same reason. Thus, the magistrate judge did not abuse his discretion by excluding the Pope Report and notes.

### 2. Excluded Testimony

Marcus Bailey and Stacey Gibbons were non-party witnesses who also worked at ESPN Zone and testified concerning their observations of racial discrimination at ESPN Zone. The magistrate excluded much of Bailey's testimony from consideration because the testimony was "irrelevant to any of Plaintiffs' claims because Plaintiffs have failed to link any of it to any of their claims." Similarly, the magistrate excluded testimony from Gibbons on the basis that appellants did not show that appellants were aware of any of the conduct Gibbons described. Finally, the magistrate also excluded testimony from Bailey as hearsay.

The magistrate ruled that statements Arnold Sye made to the consultants for Pope and Associates were inadmissible hearsay. In addition, he ruled that impressions Denise Jackson, ESPN Zone's Human Relations Director, gained from

16

interviewing employees at the restaurant were irrelevant to appellants' hostile work environment claims.

We need not decide whether the magistrate erred in excluding any of the testimony discussed because, as will be discussed below, even including all of the contested testimony, appellants cannot meet their burdens of proof.

B.  Disparate Treatment Claims

In individual disparate treatment claims, "the plaintiff bears the burden of proving that the employer discriminated against him because of his race."  Cooper v. Southern Co., 390 F.3d 695, 723 (11th Cir. 2004), rev'd in part on other grounds, Ash v. Tyson Foods, Inc., 546 U.S. 454, 456-57, 126 S. Ct. 1195, 1197 (2006).  Both appellants' § 1981 disparate treatment claims of (1) disparate work assignments and (2) failure to promote are properly evaluated under the McDonnell Douglas framework because they did not present any direct evidence of racial discrimination.[5]

The basic framework to prove employment discrimination is the familiar yet often misunderstood McDonnell Douglas burden-shifting test.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).  First, an appellant must establish a prima facie case of racial discrimination.  The elements are

_____

[5]  Direct evidence is evidence that proves discrimination without requiring any inference or interpretation.  Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).

17

different for the disparate pay and promotion claims and are discussed separately below.

Following the familiar burden shifting procedure under McDonnell Douglas, once an appellant establishes a prima facie case of employment discrimination, a presumption of discrimination arises and the burden shifts to ESPN Zone to articulate a legitimate, non-discriminatory reason for its action. Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1104-05 (11th Cir. 2001). If ESPN Zone meets this burden of production, the presumption of discrimination ends, and an appellant must establish that ESPN Zone's proffered reason is pretextual. Id.

### 1. Disparate treatment—Work Assignment Claims[6]

Appellants argue that the magistrate erred by refusing to analyze this case under the "pattern and practice" standard often used in actions brought by the government or in class actions.[7] Appellants misapprehend the Report and Recommendation's analysis. The magistrate did not rule that "pattern and practice" evidence was not admissible; rather, the magistrate determined that

---

[6] The magistrate described appellants' claims as "disparate pay claims." Appellants argue that it is more accurate to describe the claims as disparate work assignments between different sections of the restaurant that were perceived as more or less lucrative. This distinction is merely semantic insofar as the magistrate's analysis of the relevance of the pattern and practice evidence is otherwise correct.

[7] Appellant Nanji, as a busser, does not claim disparate treatment in work assignment or pay.

18

"while pattern and practice may be relevant to a claim of pretext in a private individual's case of discrimination, it cannot support a prima facie case."  The magistrate relied on Scarlett v. Seaboard Coast Line R.R. Co., 676 F.2d 1043, 1053 (5th Cir. Unit B 1982),[8] which held that individuals asserting employment discrimination claims must prove the elements articulated in McDonnell Douglas.

To establish a prima facie case of disparate treatment, the appellants must show that (1) they were qualified members of a protected class, and (2) were subjected to an adverse employment action in contrast with similarly situated employees outside the protected class.  Wilson v. B/E Aero., Inc., 376 F.3d 1079, 1087 (11th Cir. 2004).

The magistrate accurately described the probative value of appellants' "pattern and practice" evidence when he determined that it was unnecessary to evaluate the statistical evidence because "[p]laintiffs' disparate pay claims fail because none of them have offered any evidence that any similarly-situated white servers were assigned to better tables, sections, and rooms."

Even assuming, contrary to the magistrate's analysis, that appellants' statistical evidence could be used to satisfy any of the appellants' prima facie

---

[8]  The Eleventh Circuit has adopted as binding precedent all of the post-September 30, 1981 decisions of Unit B of the former Fifth Circuit.  Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir. 1982).

19

obligation to show that white servers were given *better* work assignments than appellants, the statistical evidence is insufficient to meet this burden. Both parties' experts found a statistically-significant difference in section assignments between African-American and white servers. However, appellants' expert did not present any evidence that this difference led to a difference in earnings between similarly-situated employees. In fact, ESPN Zone's expert testified that average sales per table was higher in the sections that African-American servers were more likely to be assigned. Appellants' expert correctly notes that this per table average does not demonstrate that a server's income would be higher per shift because per shift income would be dependent on number of tables served and differences between voluntary and obligatory gratuities. Nevertheless, it is appellants' burden to show that similarly-situated white servers were treated *more* favorably. Neither the statistical evidence nor appellants' conclusory allegations meets this burden, and accordingly, summary judgment on the disparate work assignment claim was proper.

### 2. Disparate Treatment—promotions

Following McDonnell Douglas, the former Fifth Circuit identified the necessary elements to establish a prima facie violation when an employee "loses out" to another applicant competing for a promotion. Crawford v. Western Electric

20

<u>Co.</u>, 614 F.2d 1300, 1315 (5th Cir. 1980).[9]  The elements of the prima facie case

are:

> (1) [plaintiffs] are members of a group protected by Title VII;
>
> (2) they sought and were qualified for positions that [the defendant
>
> employer] was attempting to fill;
>
> (3) that despite their qualifications they were rejected; and
>
> (4) that after their rejection [the defendant employer] either continued to
>
> attempt to fill the positions or in fact filled the positions with [persons
>
> outside the plaintiffs' protected class].

<u>Id.</u>; <u>see also</u> <u>Walker v. Mortham</u>, 158 F.3d 1177, 1187 (11th Cir. 1998) (noting that

erroneous dicta requiring a plaintiff to show that the promoted employee had

"equal or lesser qualifications" had entered the Eleventh Circuit's articulation of

the standard, and reiterating that <u>Crawford</u> governs).

As described above, if an appellant establishes a prima facie case of

discrimination, the burden shifts to ESPN Zone to articulate a legitimate, non-

discriminatory reason why the appellant was not given the promotion.  If ESPN

---

[9]  In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Zone does this, the burden shifts to appellants to demonstrate that ESPN Zone's reason is a pretext for discrimination.

a. Cheyne Hardin and Laquanda Plantt

Hardin and Plantt both applied to be a server trainer in February or March of 2000. Neither was given the promotion. Hardin was told by manager Sye that they already had enough trainers. Hardin testified that only white servers were hired during the time they applied, though she could not remember the names of the persons hired. When asked whether she believed she was not selected because of her race, Hardin replied that she could not say. Nonetheless, the magistrate assumed that Hardin met her prima facie case, especially because she had no discipline problems in her record.

ESPN Zone argues that Hardin's performance as a server made her unsuitable to be a trainer. This alone is a legitimate, non-discriminatory reason. Hardin cites no evidence to show that this reason is pretext other than Bailey's inadmissible hearsay testimony that a white server, Andrew Schwartzburg, was later promoted (after Hardin had resigned) with lower scores than Hardin received. We note that ESPN Zone also argues that the decision was not racially motivated because three other African-Americans servers were promoted to trainer around the time Hardin applied. This is strong evidence that the decision not to promote

22

Hardin was not the result of racial discrimination. The magistrate correctly ruled that Hardin had not rebutted ESPN Zone's non-discriminatory reason for Hardin's non-promotion.

The magistrate also found that Plantt satisfied her prima facie case. ESPN Zone argued that she was not selected for the position because of her "chronic attendance problems." Plantt replied that the attendance argument was pretext because she did not have attendance problems. The magistrate found that while ESPN Zone misstated the number of times Plantt was tardy, her attendance record was poor enough to make it a legitimate reason not to promote her.

In her brief, Plantt argues that Sye's statement that she had chronic attendance problems is inaccurate because she had only been tardy once when she applied to be trainer. But the record demonstrates that Plannt was absent two days in a row in addition to the day she was tardy at the time she applied to be a trainer. A poor attendance record is a legitimate, non-discriminatory reason to decline to promote Plantt.

In response, Plantt argues that Bailey's testimony regarding the selection of trainers supports her contentions that she was denied the promotion because of her race. However, nothing in Bailey's testimony concerns the decision to not promote Plantt to server other than his opinion that Plantt (and Hardin) should have been

selected as trainers instead of Schwartzberg. As noted above, Schwartzberg was hired and promoted well after Plantt had been denied the promotion. Therefore, according to the undisputed evidence in the record, Plantt has not meet her burden to show her attendance problems were pretext for racial discrimination.

b. Ayanna Harrington and Santrice Laney

Both Harrington and Laney applied to be bartenders at ESPN Zone. They both met the first element of the prima facie case, being members of a protected class. The magistrate assumed that they met the second element, adverse job action, when they were denied jobs tending bar because it was likely more prestigious with better pay. But the magistrate ruled that they could not demonstrate that ESPN Zone treated a similarly-situated employee who was not African American differently, as the employee promoted to bartender, Ruth Heinzman, was more qualified than Harrington and Laney because of her past experience. And so the magistrate determined that neither Harrington nor Laney met their burden to establish a prima facie case of disparate treatment with regard to the bartending position.

Appellants argue, correctly, that Harrington and Laney should not have been required to prove that the successful applicant for the promotion, Heinzman, was less or equally qualified. See Walker v. Mortham, 158 F.3d 1177, 1193 (11th Cir.

24

1998). Rather, Heinzman's alleged superior qualifications should have been understood instead as a rebuttal to the initial presumption of discrimination that appellants would then need to show to be pretextual. Id.

If Heinzman was promoted because of her previous bartending experience, this would be a legitimate, non-discriminatory reason. Appellants, however, contend that there is no admissible evidence that Heinzman (a) was a bartender, or (b) was hired because of her experience. The record evidence regarding Heinzman's promotion and qualifications comes from the testimony of Steve Astles, the assistant general manager of ESPN Zone at the time. Astles testified that he learned that another manager, Heather Shaw, had promoted Heinzman because of her bartending experience. Appellants argue that Astles' knowledge of Heinzman's qualifications is inadmissible hearsay. The magistrate ruled below that Astles' testimony was not offered for the truth of the matter asserted but rather to demonstrate Astles' state of mind with regard to Heinzman's promotion. See Wright v. Southland Corp., 187 F.3d 1287, 1304 n.21 (11th Cir. 1999).

Appellants argue that Astles' state of mind is irrelevant because he did not make the decision to promote Heinzman. This argument is unavailing because it is undisputed that Astles had the authority to approve or reject this promotion. ESPN Zone correctly argues that Astles allowed Heinzman's promotion to stand, which is

25

functionally equivalent to the decision to promote in the first place. Therefore, Astles' belief that Heinzman had previous bartending experience is a legitimate, non-discriminatory reason for Heinzman's promotion.

Appellants also argue that Heinzman's experience is a pretextual justification because the real reason Astles allowed Heinzman to remain a bartender was because it would not be "fair to Ms. Heinzman to move her back to a server position because of Ms. Shaw's mistake [in letting Heinzman apply to be bartender before her ninety-day probationary period had elapsed]." Yet this ostensible pretext is itself a legitimate, non-discriminatory reason for Heinzman's promotion that appellants fail to prove pretextual. Summary judgment was appropriate regarding Harrington and Laney's promotion claims.

Harrington also asserts that she was treated differently with regard to discipline than white employees, specifically Mullhare, because they were both accused of using racial slurs but only she was suspended. The magistrate granted summary judgment to ESPN Zone because he found that Harrington had failed to prove an adverse job action because she was compensated fully and not otherwise punished for the suspension–"[i]t was not 'objectively serious and tangible enough' to alter Harrington's 'compensation, terms, conditions, or privileges of

employment," citing <u>Gupta v. Florida Bd. of Regents</u>, 212 F.3d 571, 588 (11th Cir. 2000).  Appellants do not contest this ruling.

### c.  Taji Nanji

The magistrate found that Nanji did not present a plausible claim of an adverse job action and granted summary judgment to appellees.  Nanji does not argue otherwise on appeal.

### C.  Hostile Work Environment Claims

"A hostile work environment claim under [§ 1981] is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter te conditions of the victim's employment and create an abusive working environment."  <u>Miller v. Kenworth of Dothan</u>, <u>Inc.</u>, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting <u>Harris v. Forklift Sys.</u>, <u>Inc.</u>, 510 U.S. 17, 21 (1998)).  To establish a hostile work environment claim, an appellant must show:

> (1) that he belongs to a protected group;
> (2) that he has been subject to unwelcome harassment;
> (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin;
> (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and
> (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Id.

The "severe and pervasive" requirement has both objective and subjective components—the employee must subjectively perceive the harassment as severe enough to alter the conditions of employment and this perception must be objectively reasonable. Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998); Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999). Four factors should be considered when evaluating the objective severity of the harassment:

> (1) the frequency of the conduct;
> (2) the severity of the conduct;
> (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and
> (4) whether the conduct unreasonably interferes with the employee's job performance.

Gupta, 212 F.3d at 584 (citing Mendoza, 195 F.3d at 1246).

### 1. Cheyne Hardin

The magistrate held that Hardin was subject to severe harassment when she was called a "lazy nigger" by a co-worker in late April or May of 2000. In addition, Hardin argues that she quit shortly after being forced to work while she was ill even though another server was allowed to go home after complaining of sickness. Hardin admitted that she did not know why the other server was allowed to go home. There is no further evidence supporting Hardin's claim that she was subject to discriminatory treatment the night she was ill. The magistrate

28

determined that although Hardin reported this complaint to a manager the next day, she never followed up because she had already submitted her two-weeks notice. There is no other evidence in the record that connects this allegation of apparent harassment with any other harassment. Finally, Hardin testified that she resigned from ESPN Zone because she "was just tired of working there." Therefore, the magistrate did not err when he concluded that the epithet, while certainly severe, was isolated and did not alter the conditions of Hardin's employment.

### 2. Ayanna Harrington

Harrington alleges that she was subject to a hostile work environment because she was subjected to (1) unfair discipline, (2) managerial harassment, (3) intimidation by two white managers, and (4) co-worker's racial epithets. The racially-motivated discipline allegations arise from the treatment she received, including the suspension, after the two incidents where she was accused of using racially-charged language herself. The managerial harassments claims arose from a litany of complaints about how managers treated her during her work, but she presented no evidence that the treatment she received was racially-motivated. The incident of alleged intimidation occurred when two white managers "cornered" Harrington in a doorway and told her they wanted to see her in the office. She claims she asked them to step back but they continued to approach her and did not

29

stop until she screamed a third time. As the magistrate noted, in the five months that Harrington worked at ESPN Zone, she heard several co-workers and a manager describe her as ghetto and overheard manager Zapf tell several African-American employees they looked like monkeys.

The magistrate found that Harrington satisfied the subjective component but not the objective component of the harassment standard. The most frequent conduct, the use of the term "ghetto," was not found to be severe, while the only physically threatening incident, the "cornering," was isolated and not clearly racially motivated. Moreover, the magistrate found that Harrington could not demonstrate that the environment interfered with her job performance.

The evidence in the record supports the magistrate's decision. Much of the conduct Harrington complains of is not connected to her race, and the only conduct that is racially offensive, being called "ghetto" and once or twice overhearing co-workers being described as monkeys, was not pervasive enough to alter her conditions of employment. In particular, Harrington did not establish how often she was described as "ghetto" or overheard racial epithets directed towards co-workers—although it appears such incidents were infrequent—and thus, she did not carry her burden of demonstrating a triable issue concerning the severity and pervasiveness of the racially offensive conduct.

### 3. *Santrice Laney*

The magistrate found that Laney was not subject to any harassing conduct herself but rather she overheard several racially disparaging remarks directed at others. The magistrate correctly concluded that Laney did not meet with the subjective or objective components of harassment.

### 4. *Taji Nanji*

The magistrate found that the instances of racial epithets used against Nanji or around him were too infrequent to constitute harassment, especially because of the length of time that Nanji worked at ESPN Zone. Nanji does not argue how his employment was impacted by the alleged harassment, and we find no error in summary judgment for ESPN Zone.

### 5. *Laquanda Plantt*

Like Laney, the magistrate found that Plantt had not been subjected to any offensive behavior herself but rather overheard isolated remarks that were offensive, and thus did not meet her burden of either subjective or objective harassment severe enough to interfere with her employment. Plantt overheard Mulhare call Hardin "a lazy nigger" and testified that she heard employees use the word "ghetto," although she was unable to identify any specific instance in which it was used. Moreover, Plantt admitted that she used the term "ghetto" but not at

work. Plantt also argues that she was subject to harassment when forced to work outside despite her doctor's note indicating that she could not work in the sun. But, as ESPN Zone notes, there is no evidence that this assignment outside had anything to do with racial hostility. Given this scant evidence, Plantt cannot show that she experienced harassment so severe as to interfere with her employment.

D. Sanctions

Marx appeals the imposition of sanctions against him, arguing that the district court cannot permissibly impose § 1927 sanctions based on negligent conduct.[10] He also argues that he did not oppose the motion to compel, but rather the sanctions and the exclusion.

A district court may sanction counsel for conduct that is unreasonable, vexatious, and multiplies the proceedings. Schwartz v. Million Air, Inc., 341 F.3d 1220, 1225 (11th Cir. 2003). Section 1927 provides that a district court may sanction:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case *unreasonably and vexatiously* may be required by the court to

---

[10] Marx moves to supplement the appellate record to include (i) a letter to opposing counsel allegedly sent on March 17, 2004, indicating that Marx would notice Bailey's deposition on April 1, 2004 if ESPN Zone was available on that date and (ii) confirmation that the letter was faxed to ESPN Zone's counsel. The is no need to supplement the record because the letter is already in the record as an exhibit in ESPN Zone's motion to compel Bailey's deposition. And although the fax confirmation is not part of the record, receipt of the fax is not relevant to the issue at hand.

satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927 (emphasis added).

This court has "consistently held that an attorney multiplies proceedings 'unreasonably and vexatiously' within the meaning of the statute only when the attorney's conduct is so egregious that it is 'tantamount to bad faith.'" Amlong & Amlong, P.A. v. Denny's, Inc., 457 F.3d 1180, 1190 (11th Cir. 2006), as amended __ F.3d __, 2006 WL 4758983 (11th Cir. Sept. 17, 2007) (citation omitted). But bad faith in the context of § 1927 sanctions "turns not on the attorney's subjective intent, but on the attorney's objective conduct." Id. "In short, a district court may impose sanctions for egregious conduct by an attorney even if the attorney acted without the specific purpose or intent to multiply the proceedings." Id. at 1192.

Here, the district court applied the correct legal standard for evaluating § 1927 sanctions. The district court specifically found that Marx's failure to notify opposing counsel was in bad faith because he did not provide any explanation as to why he was unable to notify opposing counsel during the two weeks he was aware that he would be unable to attend the deposition. Therefore, we hold that the district court did not abuse its discretion in imposing § 1927 sanctions on Marx.

## IV. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's orders.